CP&LRHG 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







ON MOTION FOR REHEARING










NO. 03-95-00093-CV







Central Power and Light Company, Appellant



v.



John Sharp, Comptroller of Public Accounts of the State of Texas;


and Dan Morales, Attorney General of the State of Texas, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT


NO. 91-2800, HONORABLE JERRY DELLANA, JUDGE PRESIDING








 The opinion issued by this Court on December 6, 1995 is withdrawn and the
following opinion is substituted in its place. 

 Appellant Central Power and Light ("CP&L") appeals from a summary judgment
rendered in favor of appellees ("the Comptroller"). The dispute centers around the Comptroller's
interpretation of a provision within the Franchise Tax Act governing the computation of a
company's surplus. See Tex. Tax Code Ann. §§ 171.001(a), 171.109(b) (West 1992). We will
affirm the judgment of the trial court.



Background


 CP&L is a corporation organized under Texas law, subject to state regulation as
an electric utility company. See Tex. Rev. Civ. Stat. Ann. art. 1446c, § 3(c)(1) (West Supp.
1995). As a corporation doing business in Texas, it is required to report and pay an annual
franchise tax to the State. See Tex. Tax Code Ann. § 171.001 (West 1992 & Supp. 1995). The
franchise tax is one imposed on the value of the privilege of transacting business in Texas. 
Bullock v. National Bancshares Corp., 584 S.W.2d 268, 270 (Tex. 1979). The amount of tax due
is based on the company's taxable capital, which consists of surplus and stated capital. Tex. Tax
Code Ann. § 171.002 (West Supp. 1995). Surplus is net assets, or total assets minus total debts. 
Code § 171.109 (West 1992 & Supp. 1995). The computation of surplus is governed by Tax
Code section 171.109. That section provides in pertinent part that "a corporation must compute
its surplus . . . according to generally accepted accounting principles." Code § 171.109(b) (West
1992). The Comptroller has interpreted "generally accepted accounting principles" to include
"those broad rules of accounting formally accepted by the American Institute of Certified Public
Accountants (AICPA) . . . ." 34 Tex. Admin. Code § 3.547(d)(1) (West 1995). The rules of
accounting formally accepted by AICPA are set forth in the pronouncements of the Financial
Accounting Standards Board ("FASB"); the individual rules are referred to as Financial
Accounting Standards.

 During the relevant time period, CP&L was involved in building the South Texas
Nuclear Power Plant ("STNP"). A company's cost of financing a long-term construction project
such as STNP is referred to as Allowance for Funds Used During Construction, or "AFUDC."

 According to Financial Accounting Standard 34, all interest owed to lenders on
amounts borrowed for construction purposes must be capitalized as an asset. This interest expense
is known as AFUDC-debt. According to Financial Accounting Standard 71, a regulated utility
that uses its own funds for construction purposes must capitalize the imputed cost of using those
funds (for example, the foregone interest that could have been earned on the funds used for
construction). This cost of using a company's own funds, or equity, is known as AFUDC-equity. 
Thus, for a regulated utility, the cost of acquiring capital, whether from an outside lender or from
internal funds, is treated the same as the cost of acquiring nails, cement and construction labor: 
all are capitalized as an asset. Once the project is completed and placed in use, all capitalized
costs are added to the cost basis of the project, and are then depreciated over the life of the
structure.



The Controversy


 Because CP&L used its own funds to finance the nuclear plant, it capitalized its
AFUDC-equity in its 1990 franchise tax report pursuant to Financial Accounting Standard 71 and
paid its tax accordingly. CP&L then sought a refund of the difference between its tax as reported
and paid, and its tax as it would have been computed without capitalizing its AFUDC-equity. See
Tex. Tax Code Ann. § 111.104, .105 (West 1992). This difference amounted to approximately
three million dollars. The Comptroller denied CP&L's request for a refund, maintaining that
generally accepted accounting principles reflected in Financial Accounting Standard 71 required
CP&L to capitalize its AFUDC-equity. 

 CP&L contends that Tax Code section 171.109(b) does not require it to capitalize
its AFUDC-equity as an asset in computing its franchise tax, and attacks the Comptroller's
interpretation to the contrary as unconstitutional. CP&L argues that the Comptroller's
interpretation of Tax Code section 171.109(b) results in unequal taxation because it requires
utilities to capitalize AFUDC-equity, but does not require private companies to do so. CP&L also
claims that the Comptroller's interpretation of Tax Code section 171.109(b) forces it to compute
franchise tax liability using the "books and records" method of accounting, a circumstance which
this Court found to violate the state constitutional requirement that all taxes be equal and uniform. 
See Tex. Const. art. VIII, § 1; Bullock v. Sage Energy Co., 728 S.W.2d 465, 468 (Tex.
App.--Austin 1987, writ ref'd n.r.e.). Finally, CP&L asserts that the Comptroller's reliance on
FASB pronouncements as "generally accepted accounting principles" results in an unconstitutional
delegation of legislative power to an unofficial agency. See Tex. Const. art. III, § 1.



Discussion and Holding


 CP&L contends in its third point of error that the Comptroller's interpretation of
"generally accepted accounting principles" to comprise Financial Accounting Standards results in
tax classifications that afford disparate treatment to similarly situated taxpayers. See Tex. Tax
Code Ann. § 171.109(b) (West 1992); 34 Tex. Admin. Code § 3.547(d)(1) (West 1995). 
Financial Accounting Standard 71 provides that regulated companies must capitalize AFUDC-equity, while Financial Accounting Standard 34 does not require non-regulated companies to
capitalize AFUDC-equity. CP&L argues that because there is no rational basis justifying this
disparate treatment, the Comptroller's interpretation runs afoul of the state constitutional provision
requiring equal and uniform taxation. See Tex. Const. art. VIII, § 1.

 Administrative rules are constitutional if they are consistent with the statute and are
reasonable. Bullock v. Hewlett-Packard, 628 S.W.2d 754, 756 (Tex. 1982). CP&L essentially
attacks the Comptroller's interpretation of Tax Code section 171.109(b) as unreasonable because
it results in an unequal and non-uniform tax, in violation of the state constitution. When an
agency interpretation is in effect at the time the legislature amends the law without making
substantial change in the statute, the legislature is deemed to have accepted the agency's
interpretation. Bullock v. Marathon Oil Co., 798 S.W.2d 353, 357 (Tex. App.--Austin 1990, no
writ). The Comptroller's Franchise Tax Rule 3.547 was in effect when the legislature amended
Tax Code section 171.109. See 34 Tex. Admin. Code § 3.547 (West 1995); Tex. Tax Code Ann.
§ 171.109 (West 1992 & Supp. 1995). We therefore conduct our analysis as if the interpretation
under attack were set forth by the legislature.

 Tax classifications are constitutional unless there is no reasonable basis for the
attempted classification. Hurt v. Cooper, 110 S.W.2d 896, 901 (Tex. 1937). The party attacking
the tax has the burden to show discrimination by negating every conceivable basis which might
support it. Marathon Oil Co., 798 S.W.2d at 359. We indulge a strong presumption of
constitutional validity when reviewing statutes relating to taxation. Vinson v. Burgess, 773
S.W.2d 263, 266 (Tex. 1989). 

 We begin our discussion by noting that "the legislature of the state has frequently
placed public utilities within a class by themselves for the purpose of taxation." State v.
Southwestern Gas & Elec. Co., 193 S.W.2d 675, 678 (Tex. 1946). The Comptroller advances
this rational basis for the challenged tax classification: that regulated utilities, unlike private non-regulated enterprises, are substantially assured of recovering and earning a return on AFUDC-equity through the rate-making process. This Court has recognized that, once a constructed plant
is placed in service, a utility can recover AFUDC-equity by adding it as a cost of construction to
the utility's rate base. City of El Paso v. Public Util. Comm'n, 839 S.W.2d 895, 912-13 (Tex.
App.--Austin 1992), rev'd in part on other grounds, 883 S.W.2d 179 (Tex. 1994). Furthermore,
Financial Accounting Standard 71 provides for the capitalization of AFUDC-equity only upon
CP&L's determination that the AFUDC-equity would probably be included as a cost in its rate
base. (1)
 AFUDC-equity is valuable to CP&L and improves its true financial condition because it
is repaid through rates.

 Unlike regulated companies, non-regulated enterprises do not enjoy this high
probability that a return will be realized on their AFUDC-equity; they must depend on market
forces for any such return. AFUDC-equity therefore does not represent the same value for a non-regulated company as it does for a regulated company. The Comptroller's rule at issue here does
nothing more than recognize and account for this difference. We conclude that this difference in
value provides more than sufficient justification for the disparate treatment of AFUDC-equity
between regulated and non-regulated companies.

 CP&L urges that because regulated companies are not always allowed to recover
costs incurred in the construction of major plants, the tax does not operate equally within the
class. We disagree. When the Public Utility Commission fails to find that utility construction
costs are prudent, the Commission may disallow the inclusion of those costs in the utility's rate
base. See, e.g., El Paso v. Public Util. Comm'n, 883 S.W.2d 179, 186 (Tex. 1994); Gulf States
Utils. v. Coalition of Cities, 883 S.W.2d 739, 743 n.2 (Tex. App.--Austin 1994, no writ). This
is because "[i]t is neither just nor reasonable for a utility's customers to bear the cost of inefficient
management or poor planning." Coalition of Cities, 883 S.W.2d at 743 n.2 (citing Long Island
Lighting Co. v. Public Serv. Comm'n of the State of New York, 134 A.D.2d 135 (1987)). The
disallowance of AFUDC-equity on this basis has nothing to do with the inherent value that
AFUDC-equity represents to the company; it is simply a means of protecting ratepayers from the
financial consequences of a utility's poor decision-making. This does not change the
distinguishing feature that a regulated utility's rates are cost-based and not subject to market
pricing. Any likelihood that a regulated company's AFUDC-equity will not yield a return on the
basis of imprudence is attributable to the improper decisions of the company itself. A tax
classification that reasonably discriminates between regulated and non-regulated companies does
not lose its rationality when it fails to take into account a variable largely in control of the
company itself.

 CP&L also contends that the tax classification is unreasonable because of recently
passed legislation which affects regulated companies. The statute states in part:



The legislature finds that public utilities are by definition monopolies in many of
the services they provide and in many of the areas they serve, and that therefore
the normal forces of competition that operate to regulate prices in a free enterprise
society do not always operate, and that therefore utility rates, operations, and
services are regulated by public agencies where competition does not operate, with
the objective that this regulation shall operate as a substitute for competition.



Act of May 12, 1995, 74th Leg., R.S., ch. 765, art. 2, § 2.001, Tex. Gen. Laws 3972, 3988-89
(West Supp. 1995) (emphasis added). This bill maintains regulatory pricing as a substitute for
market-based pricing in most cases. It therefore does not defeat the rational basis for the tax
classification at issue--regulated companies still enjoy a far greater likelihood that they will realize
a return on their AFUDC-equity because of cost-based rate setting.

 CP&L next argues that the classification results in unequal taxation because
companies performing services under cost-reimbursement contracts are not required to capitalize
AFUDC-equity in computing their franchise tax. Thus, CP&L argues, these companies and
regulated enterprises are similarly situated with respect to AFUDC-equity, but the classification
treats them differently. We are not persuaded by this argument. First, the probability that such
a company will recover its AFUDC-equity depends on the operation of a contract, while a
regulated company's likelihood of recovery is substantially assured by operation of law. See Tex.
Civ. Stat. Ann. art. 1446c, § 39 (West Supp. 1995). This distinction alone would provide a
reasonable basis for requiring regulated companies to capitalize AFUDC-equity, while not
imposing the same requirement on companies operating under cost-reimbursement contracts. See
Fairmont Dallas Restaurants, Inc. v. McBeath, 618 S.W.2d 931, 933 (Tex. Civ. App.--Waco
1981, no writ) (if any reasonable distinction can be found, court must sustain tax classification). 
Second, CP&L has not offered any proof that this challenged classification has been applied to
a large class of companies operating under cost-reimbursement contracts. See Southern Clay
Prods. Inc. v. Bullock, 753 S.W.2d 781, 784 (Tex. App.--Austin 1988, no writ) (to warrant court
intervention under Texas Constitution article VIII, section 1 in a tax assessment, complaining
party must show challenged rule as construed by taxing authority has been applied to large class
of other individuals).

 CP&L offers as a final argument that the tax is unequal because a regulator cannot
value a regulated company's AFUDC-equity with any greater accuracy than an unregulated
company could value its AFUDC-equity. CP&L asserts that a regulator's valuation is necessarily
arbitrary because it is based upon estimates and derived by using any one of several economically-based algorithms. This argument ignores the fact that the classification is based on the recognition
that AFUDC-equity, whatever its specific value, represents a benefit to the company because that
value will be recovered through the rate-making process. The determined value of AFUDC-equity
as capitalized for purposes of the franchise tax will equal the value added to the company's rate
base.

 We hold this disparate tax treatment of regulated and non-regulated enterprises does
not violate the Texas Constitution, and we overrule CP&L's third point of error.

 CP&L contends in its second point of error that the Comptroller's interpretation
of "generally accepted accounting principles" in Tax Code section 171.109(b) resurrects the
Comptroller's former "books and records" rule, which we held to violate our Constitution's
prohibition against unequal taxation. See Bullock v. Sage Energy Co., 728 S.W.2d 465 (Tex.
App.--Austin 1987, writ ref'd n.r.e.). In that case, Sage attacked the Comptroller's rule which
required a corporation to compute its franchise tax based on its financial condition as shown in
its books and records of account. Id. at 465. Because Sage's shares were publicly traded, the
Securities and Exchange Commission required it to capitalize its intangible drilling costs on its
books and records. Under the Comptroller's rule, Sage was accordingly required to capitalize its
intangible drilling costs for purposes of computing its franchise tax liability. Corporations whose
shares were not publicly traded were not subject to this Securities and Exchange Commission
regulation; they were able to treat intangible drilling costs as expenses on their books and records,
and accordingly excluded those expenses from their taxable capital in computing their franchise
tax liability.

 This Court concluded that although intangible drilling costs have the same value
to all corporations, their value was ascertained by different standards under the Comptroller's
"books and records" rule. Id. at 468. Sage's intangible drilling costs were capitalized at full
value, while these same costs for similar corporations were not capitalized at all, simply by virtue
of the accounting method employed by the corporation. Id. "Accordingly, Sage was denied the
right to equal and uniform taxation provided by the Constitution." Id. Sage dealt with a rule
which essentially imposed a different "value" on costs which held the same actual value to all
parties subject to the rule. As previously discussed, AFUDC-equity does not hold the same value
for unregulated companies as it does for regulated companies. The tax classification assailed by
CP&L here does nothing more than recognize that difference. We overrule CP&L's second point
of error.

 CP&L asserts in its first point of error that the Comptroller's interpretation of
"generally accepted accounting principles" in Tax Code section 171.109(b) as including
pronouncements by the Financial Accounting Standards Board violates the state constitutional
prohibition against delegating legislative power to authority outside the legislature. See Tex.
Const. art. III, § 1; Tex. Tax Code Ann. § 171.109(b) (West 1992); 34 Tex. Admin. Code
§ 3.547(d)(1) (West 1995). In its cross-point of error, the Comptroller urges that this claim is
jurisdictionally barred because CP&L failed to raise it in its motion for rehearing before the
Comptroller. See Tex. Tax Code Ann. § 112.152 (West 1992). We must address the
Comptroller's claim first.

 In a tax refund action, the Tax Code provides the exclusive waiver of sovereign
immunity. Hammerman & Gainer, Inc. v. Bullock, 791 S.W.2d 330, 331 (Tex. App.--Austin
1990, no writ); Bullock v. Marathon Oil Co., 798 S.W.2d 353, 360 (Tex. App.--Austin 1990, no
writ). Thus in order to maintain an action against the Comptroller for a refund of taxes, a party
must meet the procedural requirements of the tax protest law. Marathon Oil, 798 S.W.2d at 360. 
Compliance with these procedures is a jurisdictional prerequisite for the trial court to hear and
decide the merits of a tax refund suit. See Robinson v. Bullock, 553 S.W.2d 196, 198 (Tex. Civ.
App.--Austin 1977, writ ref'd n.r.e.), cert. denied, 436 U.S. 918 (1978) 

 Tax Code section 112.152 provides that the "grounds of error contained in the
motion for rehearing are the only issues that may be raised in a suit" seeking a refund of taxes
paid. Tex. Tax Code Ann. § 112.152 (West 1992). CP&L failed to include its delegation
argument in the motion for rehearing, and so cannot raise it in its action for a refund. The Tax
Code procedures for seeking a refund "created a right not existing at common law and prescribed
a remedy to enforce the right; therefore the courts may act only in the manner provided by the
statutes which created the right." Robinson, 553 S.W.2d at 197 (citing Union Central Life
Insurance Co. v. Mann, 158 S.W.2d 477, 481 (Tex. 1941). We accordingly hold that the trial
court erred in denying the Comptroller's plea to the jurisdiction on CP&L's delegation argument. 
The Comptroller's cross-point of error is sustained. 

 Were we to reach appellant's delegation complaint, we would overrule it on the
merits. The legislature has delegated to the Comptroller the power to adopt rules for the
enforcement and collection of the franchise tax. Tex. Tax Code Ann. § 111.002(a) (West 1992);
see In re Johnson, 554 S.W.2d 775, 779-80 (Tex. Civ. App.--Austin 1977), writ ref'd n.r.e., 569
S.W.2d 882, 883 (Tex. 1978) (legislature may delegate duty to administer and enforce legislative
functions). This delegation of power is particularly appropriate where, as here, "the legislature
itself cannot practically and efficiently exercise the power" it has delegated. In re Johnson, 554
S.W.2d at 780. The Comptroller's adoption of Franchise Tax Rule 3.547, interpreting "generally
accepted accounting principles" in the Franchise Tax Act, falls within this delegated authority.

 CP&L does not attack the power delegated by the legislature to the Comptroller;
instead it claims that the Comptroller's interpretation of "generally accepted accounting principles"
confers legislative power onto FASB. As previously noted, the legislature is deemed to have
accepted this interpretation. Marathon Oil Co., 798 S.W.2d at 357. CP&L argues that this
interpretation, which allegedly renders the statute unconstitutional, must be rejected in favor of
one consistent with the constitution.

 Tax Code section 171.109(b) states:



Except as otherwise provided in this section, a corporation must compute its
surplus, assets, and debts according to generally accepted accounting principles. 
If generally accepted accounting principles are unsettled or do not specify an
accounting practice for a particular purpose related to the computation of surplus,
assets, or debts, the comptroller by rule may establish rules to specify the
applicable accounting practice for that purpose.



Tex. Tax Code Ann. § 171.109(b) (West 1992). The Comptroller has interpreted "generally
accepted accounting principles" to mean, "unless the context clearly requires otherwise, those
broad rules of accounting formally accepted by the American Institute of Certified Public
Accountants (AICPA) or its designees . . . ." 34 Tex. Admin. Code § 3.547(d)(1) (West 1995).

 This Court has approved the delegation of legislative authority to private entities
when the legislative purpose is discernible and there is protection against the arbitrary exercise
of the entity's power. Public Ins. Counsel v. Texas Auto. Ins. Plan, 860 S.W.2d 231, 237 (Tex.
App.--Austin 1993, writ denied); see also Oxford v. Hill, 558 S.W.2d 557, 560 (Tex. Civ.
App.--Austin 1977, writ denied) (legislature may delegate authority to establish rules to carry out
express purpose of law in question). However, FASB operates without reference to any
legislative purpose, and it does not make its pronouncements in order to fulfill or effectuate any
statute. Nor does FASB exercise any direct power or authority over Texans; its pronouncements
are effective only by virtue of legislative action adopting them as accounting standards. 

 In addition to FASB's lacking any legislative power, numerous protective
mechanisms insure that Financial Accounting Standards are not unconditionally binding on
taxpayers. According to the same interpretive rule assailed by CP&L, Financial Accounting
Standards are not to be used when "the context clearly requires otherwise." 34 Tex. Admin. Code
§ 3.547(d)(1) (West 1995). Indeed, evidence in the administrative record reflects that the Rules
of Ethics for Certified Public Accountants require a departure from generally accepted accounting
principles when compliance with the principle would result in a misleading financial statement. 
Furthermore, any danger that Financial Accounting Standards will work harm or unfairness on
taxpayers is removed by procedures through which a taxpayer may go before the Comptroller to
contest the imposition of the tax. See Tex. Tax Code Ann. § 111.104, .105 (West 1992)
(outlining procedures for taxpayer to seek refund from comptroller). These procedures also
demonstrate that the Comptroller, not FASB, holds and exercises the properly delegated power
to interpret and apply tax laws.

 Based on these considerations, we would hold that the contested interpretation of
Tax Code section 171.109(b) does not confer any legislative power on FASB; the interpretation
simply incorporates the Board's pronouncements as standards to be used in computing taxes under
the laws set forth in the Franchise Tax Act. The supreme court has approved the legislature's
incorporation of standards promulgated by an unofficial agency into statutes. Texas Workers'
Compensation Comm'n v. Garcia, 893 S.W.2d 504, 522 (Tex. 1995); Dudding v. Automatic Gas
& Co., 193 S.W.2d 517, 520 (Tex. 1946).

 In light of these same considerations, we disagree with CP&L's contention that the
legislature's incorporation of future pronouncements by FASB bestows legislative authority on
that body. In Garcia, the court dealt with the incorporation of the American Medical
Association's Guides to the Evaluation of Permanent Impairment (the "Guides") into the Texas
Workers' Compensation Act. Garcia, 893 S.W.2d at 521, 525. The legislature adopted a
particular edition of the Guides as the basis for rating "impairments" under the Act, as part of an
effort to provide more objectivity in determining long-term compensation awards. Id. at 522-523,
n.12., 526. In upholding the use of the Guides' standards against a due-course-of-law challenge,
the court suggested that the specification of a particular edition of the Guides "creates a potential
administrative problem." Id.

 The legislature in the Franchise Tax Act directed taxpayers to employ "generally
accepted" principles in computing their tax liability; it did not freeze these principles in time. Nor
did the legislature, in implicitly accepting the Comptroller's interpretation, incorporate a particular
edition of FASB pronouncements into the Franchise Tax Act. Thus, the legislature avoided the
"potential administrative problem" identified in Garcia. Given the Comptroller's ongoing
oversight of the application of these Standards, we do not see how the incorporation of future
Standards provides any basis--other than that we have already disposed of--for the proposition that
FASB wields any legislative power.

 Having overruled CP&L's points of error, we affirm the judgment of the trial
court.



 

 Bea Ann Smith, Justice

Before Chief Justice Carroll, Justices Jones and B. A. Smith

Affirmed

Filed: April 3, 1996

Publish


1.   Indeed, in its response to interrogatories, CP&L stated that the Public Utility
Commission "sometimes allows a utility to recover all or a portion of the AFUDC that is
capitalized during a construction period." 



uate any
statute. Nor does FASB exercise any direct power or authority over Texans; its pronouncements
are effective only by virtue of legislative action adopting them as accounting standards. 

 In addition to FASB's lacking any legislative power, numerous protective
mechanisms insure that Financial Accounting Standards are not unconditionally binding on
taxpayers. According to the same interpretive rule assailed by CP&L, Financial Accounting
Standards are not to be used when "the context clearly requires otherwise." 34 Tex. Admin. Code
§ 3.547(d)(1) (West 1995). Indeed, evidence in the administrative record reflects that the Rules
of Ethics for Certified Public Accountants require a departure from generally accepted accounting
principles when compliance with the principle would result in a misleading financial statement. 
Furthermore, any danger that Financial Accounting Standards will work harm or unfairness on
taxpayers is removed by procedures through which a taxpayer may go before the Comptroller to
contest the imposition of the tax. See Tex. Tax Code Ann. § 111.104, .105 (West 1992)
(outlining procedures for taxpayer to seek refund from comptroller). These procedures also
demonstrate that the Comptroller, not FASB, holds and exercises the properly delegated power
to interpret and apply tax laws.

 Based on these considerations, we would hold that the contested interpretation of
Tax Code section 171.109(b) does not confer any legislative power on FASB; the interpretation
simply incorporates the Board's pronouncements as standards to be used in computing taxes under
the laws set forth in the Franchise Tax Act. The supreme court has approved the legislature's
incorporation of standards promulgated by an unofficial agency into statutes. Texas Workers'
Compensation Comm'n v. Garcia, 893 S.W.2d 504, 522 (Tex. 1995); Dudding v. Automatic Gas
& Co., 193 S.W.2d 517, 520 (Tex. 1946).

 In light of these same considerations, we disagree with CP&L's contention that the
legislature's incorporation of future pronouncements by FASB bestows legislative authority on
that body. In Garcia, the court dealt with the incorporation of the American Medical
Association's Guides to the Evaluation of Permanent Impairment (the "Guides") into the Texas
Workers' Compensation Act. Garcia, 893 S.W.2d at 521, 525. The legislature adopted a
particular edition of the Guides as the basis for rating "impairments" under the Act, as part of an
effort to provide more objectivity in determining long-term compensation awards. Id. at 522-523,
n.12., 526. In upholding the use of the Guides' standards against a due-course-of-law challeng