TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-98-00718-CV






Robert D. Berry and Andrew Dudney, Appellants



v.



State Farm Mutual Automobile Insurance Company; Texas Farmers Insurance

Company; and Mid-Century Insurance Company of Texas, Appellees





FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT


NO. 96-02899, HONORABLE F. SCOTT MCCOWN, JUDGE PRESIDING 







 Appellants Robert D. Berry and Andrew Dudney sued appellees, State Farm
Mutual Automobile Insurance Company, Texas Farmers Insurance Company, and Mid-Century
Insurance Company of Texas (collectively, "the insurers"), for allegedly violating article 5.07-1
of the Texas Insurance Code by refusing to cover the full cost of original manufacturer
replacement parts pursuant to the claims appellants filed under their standard Texas personal
automobile insurance policies. See Tex. Ins. Code Ann. art. 5.07-1 (West Supp. 2000). Both
sides moved for summary judgment. The trial court granted the insurers' motion for summary
judgment and denied appellants' motion on grounds that Berry and Dudney had failed to plead
facts establishing a cause of action under article 5.07-1. Berry and Dudney now appeal the trial
court's decision, challenging its construction of the statute. We will affirm the judgment.



Statutory Background 


 The sole issue in this appeal involves the proper construction of article 5.07-1
of the Texas Insurance Code, subsection (a) of which provides as follows:


Repair of Motor Vehicles; Disclosure of Consumer Information


(a) Except as provided by rules duly promulgated by the commissioner, under
an auto insurance policy that is delivered, issued for delivery, or renewed in
this state an insurer may not, directly or indirectly, limit its coverage under
a policy covering damage to a motor vehicle by specifying the brand, type,
kind, age, vendor, supplier, or condition of parts or products that may be
used to repair the vehicle or by limiting the beneficiary of the policy from
selecting a repair person or facility to repair damage to the motor vehicle
covered under the policy.



Tex. Ins. Code Ann. art. 5.07-1(a) (West Supp. 2000). This provision was an amendment to a
1991 insurance reform bill designed to restructure the regulation of the insurance industry in
Texas. See Act of May 2, 1991, 72d Leg., R.S, ch. 242, 1991 Tex. Gen. Laws 939. Article
5.07-1, in particular, was enacted in response to the perceived unfairness of the claims-settlement
practices of many automobile insurance companies. Specifically, it appears that insurance
companies were regularly forcing policyholders to patronize only certain designated repair shops
as a condition of coverage. (1) Thus, policyholders could not choose where to have the repairs made
if they wished to have the bill paid by their insurance company. The Legislature's committee
hearings and floor debates indicate that article 5.07-1 was largely motivated by a desire to stop
this practice and thereby provide policyholders with the freedom to choose where to have their
automobiles repaired, as well as to encourage competitive bidding among various repair shops. 
See Hearing on Tex. H.B. 2 Before House Comm. on Ins., 72d Leg., R.S. (April 2, 1991) (tape
available from House Committee Coordinator's Office); Hearing on Tex. S.B. 1303 Before Senate
Comm. on Econ. Dev., 72d Leg., R.S. (April 4, 1991) (tape available from Senate Staff Services
Office); Debates on Tex. H.B. 2 on the Floor of the House, 72d Leg., R.S. (May 1 and May 27,
1991) (tapes available from House Committee Coordinator's Office).

 A secondary motivation behind article 5.07-1, and the one with which we are
concerned here, was a desire to give policyholders a choice of what parts to use in making the
repairs. In the automotive industry, there are three general classes of replacement parts. The first
class is comprised of new parts made by or on behalf of the automobile's original manufacturer. 
These are commonly referred to as new Original Equipment Manufacturer parts or "OEM parts." 
The second class of parts, including used, reconditioned, recycled, and salvaged OEM parts, is
normally referred to as used parts. The third class includes aftermarket parts or those parts that
are not made or used by the automobile's original manufacturer. These aftermarket parts, along
with used parts, are normally collectively referred to as "non-OEM" parts. (2) 

 Until recent years, repairing automobiles with non-OEM parts was not an option
because as a practical matter, the only available replacement parts were those produced by or on
behalf of the automobile's original manufacturer. But recently, the aftermarket parts industry has
flourished and insurers nationwide have since routinely used the price of non-OEM parts as a
basis to calculate the amount they will pay for the replacement parts used in repairs. Because
these non-OEM parts are often significantly less expensive than new OEM parts, insurance
companies are able to save millions of dollars each year by this practice. (3) 

 Although the use of non-OEM parts in automobile repairs has been economically
beneficial to insurers, the widespread use of these parts has raised many concerns that are important
in framing this dispute. Many of the serious problems associated with the use of non-OEM parts
were presented to the Legislature in committee hearings and floor debates during the 1991
legislative session. The House and Senate committees heard substantial testimony indicating that
many non-OEM parts consistently fail to provide the same fit, quality, and safety as their new
OEM counterparts. See Hearing on Tex. H.B. 2079 Before House Comm. on Ins., 72d Leg.,
R.S. (April 2, 1991) (tape available from House Committee Coordinator's Office); Hearing on
Tex. S.B. 1303 Before Senate Comm. on Econ. Dev., 72d Leg., R.S. (April 4, 1991) (tape
available from Senate Staff Services Office). According to many of the witnesses and the sponsors
of each bill, these parts are often made according to different specifications and frequently do not
fit the automobiles for which they are intended; are more likely to rust or corrode due to
inadequate priming and corrosion protection; and are often structurally inferior, providing less
safety protection in collisions than new OEM parts. See Hearing on Tex. S.B. 1303 Before
Senate Comm. on Econ. Dev., 72d Leg., R.S. (April 4, 1991) (tape available from Senate Staff
Services Office). Of particular concern is the use of non-OEM "crash parts" such as hoods,
bumpers, and fenders. Apparently, these parts often are not tested in accordance with federal
safety regulations, and their inferior performance in collisions is potentially life-threatening. 
Furthermore, it appears that repairs made with non-OEM parts often void existing warranties and
reduce the vehicle's resale value. 

 At the time the Legislature first heard these concerns, it was considering two
related pieces of legislation, House Bill 2079 and Senate Bill 1303. See Tex. H.B. 2079, 72d
Leg., R.S. (1991); Tex. S.B. 1303, 72d Leg., R.S. (1991). Although both bills ultimately failed
to pass, they were important precursors to the amendment to House Bill 2 which became codified
as article 5.07-1. See Act of May 2, 1991, 72d Leg., R.S., ch. 242, § 2.11, 1991 Tex. Gen.
Laws 939, 958, since amended by Act of April 28, 1997, 75th Leg., R.S., ch. 399, § 1, 1997
Tex. Gen. Laws 1637, 1637-38, codified at Tex. Ins. Code Ann. art. 5.07-1 (West Supp. 2000).


Procedural Background

 This specific controversy arises out of two separate insurance claims appellants
Berry and Dudney filed with their automobile insurance companies for damages their vehicles
sustained in two unrelated traffic accidents. The claims adjusters for the insurers evaluated the
damage to Berry's five-year-old van and Dudney's three-year-old car and prepared estimates
reflecting the amounts they would pay for the necessary repairs. These estimates included
itemized breakdowns indicating the amounts the insurers were willing to pay for each part that
needed to be replaced.

 Some of the parts listed on the estimates were accompanied by the notation "LKQ,"
an abbreviation for "like kind and quality." This notation indicated that the insurers were basing
the amount of compensation they would provide for the designated part on the price of a non-OEM replacement part rather than a new OEM part. Upon realizing the significance of the
"LKQ" designation, Berry and Dudney protested and requested that they be paid the amount of
money necessary to have their vehicles repaired with new OEM parts. Mid-Century and State
Farm refused and advised Berry and Dudney that if they wanted new OEM parts, Berry and
Dudney would be responsible for paying the difference in price. Faced with the choice of
accepting non-OEM parts or making up the difference in cost, Berry opted to pay the extra money
and have his van's rear bumper and taillight replaced with new OEM parts. Dudney, on the other
hand, elected to have his car's front grill, bumper, and pinstriping replaced with non-OEM parts. 


 Berry and Dudney proceeded to file separate suits against State Farm, Mid-Century,
and Texas Farmer's Insurance on their own behalf and on behalf of a proposed plaintiff class of
policyholders, alleging, inter alia, breach of contract, breach of the duty of good faith and fair
dealing, and violations of the Deceptive Trade Practices Act and the Unfair Claim Settlement
Practices Act. See Tex. Bus. & Com. Code § 17.46 (West Supp. 2000); Tex. Ins. Code Ann. art.
21.21-2 (West Supp. 2000). They eventually consolidated their suits and abandoned their claims
for breach of contract, breach of the duty of good faith and fair dealing, and violations of the
Deceptive Trade Practices Act and the Unfair Claim Settlement Practices Act. 

 Thereafter, appellants proceeded solely on the theory that the insurers had limited
appellants' coverage and thereby violated article 5.07-1 of the Insurance Code by specifying the
type, kind, or condition of the parts that could be used to repair their vehicles. Appellants further
maintained that the insurers were "improperly limiting coverage to an amount less than the actual
cost of the replacement part[s] via 'depreciation' or 'betterment.'" (4) As their remedy, Berry and
Dudney requested that the court order the insurers to pay for the difference between the cost of
the used or non-OEM parts and the cost of new OEM parts. The insurers responded with a
motion for summary judgment, maintaining that as a matter of law, article 5.07-1 does not require
insurance companies to pay for new OEM parts in satisfaction of every valid insurance claim and
that appellants failed to plead facts sufficient to establish a cause of action under article 5.07-1. 
Berry and Dudney countered with their own cross-motions for summary judgment.

 After considering the arguments of counsel and the summary-judgment proof, the
trial court ruled in favor of the insurers on both motions. In granting the insurers' motion for
summary judgment and denying Berry and Dudney's cross-motion, the trial court held that the
insurers may, consistent with article 5.07-1, use non-OEM parts in writing repair estimates so
long as the insurers pay an amount sufficient to purchase and install replacement parts of like kind
and quality as required by the standard Texas personal automobile insurance policy. (5) 


DISCUSSION

 The sole issue presented is strictly one of statutory construction. We must decide
whether article 5.07-1 of the Texas Insurance Code requires auto insurers to pay for new OEM
parts to the exclusion of all other parts when adjusting claims made under a standard Texas
personal automobile insurance policy. See Tex. Ins. Code Ann. art. 5.07-1 (West Supp. 2000). 
At the outset, we emphasize the limited scope of our decision. We do not decide here whether
the non-OEM parts on which appellants' insurers based their estimates satisfy the insurers'
contractual obligation to provide for replacement parts of like kind and quality. Because
appellants abandoned this issue at the trial-court level when they dispensed with their breach-of-contract claim, this question is not properly before us. Nor do we express any opinion as to
whether the evidence would support a finding of misrepresentation or fraud under the Deceptive
Trade Practices Act or the Unfair Settlement Claims Practices Act. See Tex. Bus. & Com. Code
Ann. § 17.41 (West 1987 & Supp. 2000); Tex. Ins. Code Ann. art. 21.21 (West 1981 & Supp.
2000). Appellants also abandoned these causes of action at the trial court. Rather, the only issue
before us is the proper construction of article 5.07-1 of the Insurance Code.

 Both parties acknowledge that, in addition to its statutory authority, this provision
was made contractually binding because it was incorporated into their policy when enacted. They
disagree, however, on the correct interpretation of the statute and its effect on the remainder of
the standard Texas automobile insurance policy. Specifically, the parties dispute the statute's
impact on the provision that contractually limits the insurers' liability. That provision reads:


Our limit of liability for loss will be the lesser of the:


(1) Actual cash value of the stolen or damaged property; 


(2) Amount necessary to repair or replace the property with other of like kind and
quality; or


(3) Amount stated in the Declarations of this policy.



(Emphasis added.)

 The crux of this dispute involves the second, so-called "like kind and quality"
provision. Berry and Dudney maintain that this provision has been abrogated to the extent it
conflicts with article 5.07-1. They contend that by adjusting claims using the price of non-OEM
parts--even if they are non-OEM parts of like kind and quality--the insurers are violating article
5.07-1 by directly or indirectly limiting the policyholders' coverage by specifying the type, kind,
or condition of the parts that may be used to repair their vehicles. Consequently, appellants argue
that insurers must always pay for OEM parts, absent the enactment of administrative rules
providing otherwise, and that the "like kind and quality" provision in the standard Texas
automobile insurance policy is now invalid insofar as it would otherwise allow insurers to pay
only for the cost of non-OEM parts of like kind and quality. Appellants insist that any other
interpretation would render the statute meaningless. 

 Although we share appellants' concerns about the many problems associated with
the use of non-OEM parts, we cannot conclude that the Legislature, by enacting article 5.07-1,
intended to revoke the "like kind and quality" provision of the standard automobile insurance
policy, thus requiring insurers to pay for new OEM replacement parts in satisfaction of all valid
claims, regardless of the age and condition of the vehicle before the accident and the availability
of non-OEM parts of like kind and quality. Such a holding would violate the legislative intent
behind article 5.07-1, as well as the deference we are obligated to give to the interpretation the
Texas Department of Insurance (the "Department") has given the statute.

 Determining the proper construction of a statute and the propriety of a ruling on
a motion for summary judgment are both questions of law. See Texas Med. Liab. Trust v. Zurich
Ins. Co., 945 S.W.2d 839, 842 (Tex. App.--Austin 1997, pet. denied); Johnson v. City of Fort
Worth, 774 S.W.2d 653, 656 (Tex. 1989). To prevail on a motion for summary judgment, the
movant must establish that there is no genuine issue of material fact and that the movant is entitled
to judgment as a matter of law. See Tex. R. Civ. P. 166a(c); Cathey v. Booth, 900 S.W.2d 339,
341 (Tex. 1995). Rendition of summary judgment is proper when a respondent has failed to state
a cause of action upon which relief can be granted. See Holt v. Reprod. Servs., Inc., 946 S.W.2d
602, 605 (Tex. App.--Corpus Christi 1997, pet. denied); Cole v. Hall, 864 S.W.2d 563, 566 (Tex.
App.--Dallas 1993, writ denied).

 The determination here of whether Berry and Dudney stated a viable cause of action
is entirely dependent upon how we construe article 5.07-1. Our analysis is guided by well-established rules of statutory construction. The fundamental rule controlling the construction of
a statute is to ascertain the intent of the Legislature as expressed in the language of the statute and
to give effect to that intent. See Hidi v. State & County Mut. Fire Ins. Co., 988 S.W.2d 441, 445
(Tex. App.--Austin 1999, pet. filed); Union Bankers Ins. Co. v. Shelton, 889 S.W.2d 278, 280
(Tex. 1994). When determining legislative intent, we look to the language of the statute, the
legislative history, the circumstances under which the statute was enacted, the object sought to be
obtained, the consequences of a particular construction, and the administrative construction of the
statute. See Tex. Gov't Code Ann. § 311.023 (West 1998); Union Bankers Ins. Co., 889 S.W.2d
at 280; Hidi, 988 S.W.2d at 445. We also consider at all times "the old law, the evil, and the
remedy." Tex. Gov't Code Ann. § 312.005 (West 1998). Finally, we give serious consideration
to an agency's interpretation of an ambiguous statute that the agency is charged with enforcing,
especially when it has special expertise in the area, so long as that interpretation is reasonable. 
See Tarrant Appraisal Dist. v. Moore, 845 S.W.2d 820, 823 (Tex. 1993); Texas Utils. Elec. Co.
v. Sharp, 962 S.W.2d 723, 726 (Tex. App.--Austin 1998, pet. denied). 

 With these principles in mind, we turn to the language of the statute. First, we
observe that there is no language in article 5.07-1 expressing any intent to abrogate the "like kind
and quality" standard that has served as a limitation of liability under the standard Texas
automobile insurance policy since 1979. Furthermore, there is no indication that the legislature
intended to affirmatively require insurers to pay for new OEM parts in every claim or to otherwise
prohibit the use of non-OEM parts when adjusting claims. Had the legislature intended to
mandate the universal use of OEM parts, it certainly could have done so by express language. 
The statute instead contains a series of prohibitions involving insurance carriers and their
obligations, but it is completely silent regarding any affirmative duty; the statute expressly leaves
this to the Department.

 Next, as both parties agree and as is evident from the House floor debates, the
harm that article 5.07-1 was intended to remedy was primarily the insurers' practice of forcing
policyholders to have their vehicles repaired only at specified shops and, secondarily, their
dictating the types of replacement parts that could be used to make the repairs. See Debates on
Tex. H.B. 2 on the Floor of the House, 72d Leg., R.S. (May 1 and May 27, 1991) (tapes
available from House Committee Coordinator's Office). Prior to the enactment of article 5.07-1,
many insurers had formed alliances with particular automobile repair shops and forced their
policyholders to use only those shops. In return for this guarantee of business, these shops agreed
to repair the policyholders' vehicles using only the non-OEM parts specified by the insurers. 
Article 5.07-1 was passed to prohibit this practice. As a result, policyholders are now not only
free to choose the shop where their vehicle is repaired, but they are also free to make the ultimate
decision of what parts will be used. 

 To be sure, some individual legislators shared Berry and Dudney's concerns and
expressed a desire to severely restrict the use of non-OEM parts. But the legislative history
surrounding the evolution of the statute's wording reveals that the Legislature, by enacting only
the amendment to House Bill 2 instead of the two original stand-alone bills, did not intend the
result appellants suggest. (6) The legislative history indicates that the legislative body rejected the
restrictions that appellants urge article 5.07-1 imposes. 

 The deletion of a provision in a pending bill discloses a legislative intent to reject
the proposal. See Transportation Ins. Co. v. Maksyn, 580 S.W.2d 334, 337-38 (Tex. 1979). Just
as we assume that every word in a statute has been used for a purpose, we presume that every
word excluded was excluded for a purpose. See Southwestern Bell Tel. Co. v. Public Util.
Comm'n, 888 S.W.2d 921, 926 (Tex. App.--Austin 1994, writ denied). A review of the proposed
bills shows that the range of proposed restrictions on insurers was progressively narrowed as the
statute's language made its way through the legislative process. Indeed, the legislature considered
and rejected language that would have specifically and unambiguously provided for what
appellants claim article 5.07-1 requires. Subsections (b) and (d) of proposed Senate Bill 1303
read:


(b) An insurer may not require the use of non-original aftermarket crash parts in
the repair of an insured's motor vehicle unless:


 (1) the insured has consented in writing; and


 (2) the insurer has given the insured a written estimate that meets the
requirements of Subsection (c) of this section.


. . .


(d) If the insured refuses to give written consent to the use of nonoriginal
aftermarket crash parts, the insurer shall have the insured's motor vehicle repaired
with aftermarket crash parts made by or for the manufacturer of the motor vehicle. 
An insurer may not charge an insured an additional fee for the use of original
aftermarket crash parts.



Tex. S.B. 1303, 72d Leg., R.S. (1991) (emphasis added).

 This language would have accomplished precisely what appellants maintain article
5.07-1 provides, i.e., a right to require insurers to pay for the full cost of new OEM parts. But
the Legislature declined to adopt the proposal. Instead, it chose language more similar to that
found in proposed House Bill 2079. (7) And even then, only a portion of House Bill 2079 became
law. The Legislature refused to adopt language that would have prohibited insurance companies
in certain instances from controlling or limiting in any way the brand, type, kind, age, price,
quality, or condition of replacement parts or products for which the insurer would compensate the
insured. See Tex. H.B. 2079, 72d Leg., R.S. (1991). That provision, which would have
prohibited insurers from limiting the amount they would compensate policyholders for
replacement parts, was rejected along with Senate Bill 1303 in its entirety. As a result, we are
left only with the enacted language. 

 Because it rejected language that would have reached the result Berry and Dudney
seek here, the Legislature thereby demonstrated its intent to prohibit insurers only from directly
or indirectly limiting coverage by specifying the parts to be used--not from using the cost of non-OEM parts of like kind and quality as a basis for calculating the proper amount of compensation
to provide. This intent becomes even more clear once we consider that the Legislature is assumed
to enact a statute with complete knowledge of the existing law and with reference to it. See Acker
v. Texas Water Comm'n, 790 S.W.2d 299, 301 (Tex. 1990). We believe this same assumption
should apply with regard to the Legislature's awareness of the existing rules and regulations
enacted by a state agency pursuant to the authority conferred to it by the Legislature. Had the
Legislature disapproved of the "like kind and quality" provision that the Department incorporated
into the standard Texas auto insurance policy as it was authorized to do under article 5.06 or 5.96,
the Legislature easily could have revoked that provision when it amended article 5.07-1 during
the 1997 legislative session. See Act of April 28, 1997, 75th Leg., R.S., ch. 399, § 1, 1997 Tex.
Gen. Laws 1637, 1637-38. Instead, the provision has remained unaltered since 1991 through four
legislative sessions.

 Our interpretation is further supported by the construction the Department has given
article 5.07-1. While not controlling, the contemporaneous construction of a statute by the
administrative agency charged with its enforcement is entitled to great weight. See Quick v. City
of Austin, 4 S.W.3d 193, 207 (Tex. 1998); State v. Public Util. Comm'n, 883 S.W.2d 190, 196
(Tex. 1994). If a statute can be reasonably read as the agency has ruled, and that reading is in
harmony with the rest of the statute, then we are bound to accept that interpretation even if other
reasonable interpretations exist. See City of Plano v. Public Util. Comm'n, 953 S.W.2d 416, 421
(Tex. App.--Austin 1997, no pet.) (citing Quorum Sales, Inc. v. Sharp, 910 S.W.2d 59, 64 (Tex.
App.--Austin 1995, writ denied)). 

 The Legislature has assigned to the Department the authority to enforce art. 5.07-1
and the other provisions of the Insurance Code. See Tex. Ins. Code Ann. art. 1.10, §§ 1, 7 (West
Supp. 2000). The Department has never interpreted article 5.07-1 to require insurers to pay for
new OEM parts when settling claims, save those situations where only a new OEM part would
satisfy the "like kind and quality" requirement of the policy. In a 1991 staff petition, a division
of the Department specifically concluded that the "like kind and quality" policy provision
remained operative, notwithstanding the passage of article 5.07-1. It determined that "the words
'of like kind and quality' are general words that do not appear to specify 'the brand, type, age,
or condition of parts or products' to be used." Later, upon adopting section 5.501 of the Texas
Administrative Code--an administrative rule designed to implement and ensure compliance with
article 5.07-1--the Department emphasized that the insurers' liability was limited to a "reasonable
rate of reimbursement" and made no mention of any prohibition against using non-OEM parts as
a basis for calculating the appropriate amount of compensation. See 28 Tex. Admin. Code §
5.501(d) (1993). The Department then issued a 1995 bulletin in which the Commissioner stated
that the "limitation of reimbursement to the reasonable cost of necessary repairs is not a violation
of the statute." Commissioner's Bulletin No. B-0004-95 (March 21, 1995). And finally, in a
1996 notice sent to State Farm, the Department further clarified its position, declaring that a
correct interpretation of article 5.07-1 leads to "neither the extreme of requiring original
equipment manufacturer parts, nor the extreme of allowing the insurer to specify parts." It
reiterated that insurers need only pay for the reasonable cost of parts of like kind and quality.

 The Department has thus consistently stated that the "like kind and quality"
provision of the standard Texas automobile policy remains unaffected and has construed the statute
only to prohibit insurers from dictating to the policyholders the specific repair shop and parts that
must be used as a condition of coverage. Rather than interpreting it as a prohibition against using
the price of non-OEM parts of like kind and quality as a benchmark for calculating the reasonable
cost of replacement parts, the Department has always considered article 5.07-1 to be a prohibition
against forcing policyholders to use specific repair shops or replacement parts. Furthermore, we
point out that the Legislature has subsequently amended article 5.07-1 and declined to alter any
of the statutory language material to this dispute, thus acquiescing in the Department's
interpretation. See Sharp v. House of Lloyd, Inc., 815 S.W.2d 245, 248 (Tex. 1991); Central
Power & Light Co. v. Sharp, 919 S.W.2d 485, 489 (Tex. App.--Austin 1996), writ denied per
curiam, 960 S.W.2d 617 (Tex. 1997). The doctrine of legislative acceptance provides that when
an agency's interpretation of a statute with doubtful meaning is in effect at the time the Legislature
amends the law without making substantial changes to the statute, the Legislature is deemed to
have accepted the agency's interpretation. See Fleming Foods, Inc. v. Sharp, 951 S.W.2d 278,
281-82 (Tex. App.--Austin 1997, pet. denied). Because the Legislature amended article 5.07-1
in 1997 without making any substantial changes, we conclude that it has ratified the Department's
interpretation. 

 Appellants nevertheless contend that even if we reach this conclusion, such an
interpretation is impermissible because it results in an irreconcilable conflict between the statute
and the "like kind and quality" policy provision, deprives the statute of all meaning, and provides
policyholders with no more protection than they had before the statute's enactment. We disagree.

 While we observe that there is some tension between the "like kind and quality"
policy language and the statutory prohibition against directly or, more significantly, indirectly
limiting a policyholder's coverage by specifying the type, kind, or condition of parts that may be
used to repair the vehicle, we believe the two provisions can be reconciled. Although the statute
takes away from insurers the power to specify the type, kind, or condition of the parts actually
used to repair vehicles, insurers are nevertheless only obligated to pay for parts of like kind and
quality in accordance with the standard policy provision. In other words, although insurers are
prohibited from forcing policyholders to accept non-OEM parts, the amount of money that
insurers must provide as compensation for the parts that policyholders ultimately choose may still
be limited to the cost of parts of like kind and quality. 

 This construction does not divest the statute of all meaning as appellants contend. 
Article 5.07-1 shifts a substantial amount of control over the satisfaction of claims from the
insurance companies to the policyholders. As stated previously, prior to the statute's enactment
insurers could force policyholders to have their vehicle repaired at a specific shop using only the
type or kind of parts designated by the insurers. If a policyholder wished to use the services of
another shop or to have the repairs made with parts other than those specified by the insurer, the
insurance company could threaten not to pay. This statute put an end to that practice. Now
automobile insurers can no longer directly or indirectly limit coverage by refusing to pay for the
reasonable cost of parts and repairs simply because the repairs were performed at an unapproved
shop or because a policyholder decides to have the repairs made with parts other than those
specified by the insurer. 

 Although we are sympathetic to appellants' concerns regarding the quality of some
non-OEM parts, we do not construe article 5.07-1 as requiring insurers to pay for new OEM parts
in every instance--including those situations where non-OEM parts of like kind and quality are
available. Such a holding would overstate the insurers' obligations under both the policy and the
statutory scheme and would require insurers to pay for new OEM parts in all situations, regardless
of the age or condition of the vehicle prior to the accident or the quality of available non-OEM
parts.

 At the same time, however, we must also reject appellees' argument that the statute
only forbids insurers from directly specifying the type, brand, or kind of part with which a vehicle
may be repaired under the policy. This argument fails because it disregards the statute's
prohibition against indirectly limiting coverage. It is foreseeable that insurers could apply
economic pressure in order to indirectly force policyholders to use a certain type, brand, or kind
of part to repair an insured vehicle. By limiting the amount it pays on a claim to the cost of an
inferior part, an insurer could thereby violate article 5.07-1 by indirectly specifying the brand,
type, or kind of parts that the policyholder could, as a practical manner, use to repair the vehicle. (8)



CONCLUSION

 While we share appellants' concerns that policyholders might be coerced into
accepting substandard and possibly dangerous replacement parts in some situations, we cannot say
as a matter of law that all non-OEM parts are substandard and that insurers must pay for new
OEM parts in every claim, regardless of the age or condition of the covered vehicle prior to the
accident or the quality of available non-OEM parts. The conclusion appellants urge us to make
goes too far and is contrary to the legislative intent as evidenced by the statutory language and the
legislative history. Furthermore, it disregards the weight that must be given to the Department's
construction of the statute.

 Thus, we hold that article 5.07-1 does not abrogate the "like kind and quality"
obligation under the standard Texas personal automobile insurance policy and does not require
insurance companies to pay for new OEM parts in the satisfaction of all legitimate claims. Having
so concluded, it follows that the facts as pleaded by appellants do not establish a cause of action
under article 5.07-1 of the Insurance Code. Accordingly, we hold that the district court properly
granted summary judgment in favor of the Department. The district court's judgment is affirmed. 



 


 Mack Kidd, Justice

Before Chief Justice Aboussie, Justices Kidd and B. A. Smith

Affirmed

Filed: January 6, 2000

Publish
1. The summary-judgment evidence in the record indicates that pressure to enact this legislation
originated with a group of independent glass contractors who complained that they were losing
business as a result of private "networking" arrangements made between insurance companies and
large windshield manufacturers. Pursuant to these arrangements, many insurers were entering
into exclusive contracts with windshield manufacturers and certain "preferred" independent shops
whereby the insurance companies would require policyholders to use only those specified shops
when having repairs made under their policies in return for the repair shops' pledge to use less
expensive aftermarket replacement parts.
2. As a practical matter, used, reconditioned, recycled, and salvaged OEM parts (collectively,
"used parts") are usually classified with non-OEM parts--notwithstanding the fact that they were
at one time new OEM parts. For purposes of this discussion, all references to non-OEM parts
should be deemed to refer to used parts as well.
3. A schedule included in the record indicates that from 1984 to 1994, State Farm saved over
$100 million each year by using non-OEM parts in adjusting its claims. Over that same ten-year
period, the schedule shows that State Farm saved a total of over $1.25 billion.
4. Appellants' argument is essentially that the insurers are prohibited from taking a credit--also
referred to as a "betterment"--in the event a replacement part makes the repaired vehicle more
valuable than it was in its pre-accident condition. See Great Tex. County Mut. Ins. Co. v. Lewis,
979 S.W.2d 72 (Tex. App.--Austin 1998, no pet.).
5. The Department of Insurance promulgates standard Texas personal automobile insurance
policy forms that specify the minimum coverage insurance companies must provide to their
policyholders in Texas. See Tex. Ins. Code Ann. art. 5.06 (West Supp. 2000).
6. Contrary to Berry and Dudney's assertion, the legislative history does not indicate any
intention to require insurers always to pay for the cost of new OEM parts when adjusting claims. 
In fact, Representative Cavazos, the sponsor of House Bill 2079 and one of the amendment's
supporters, commented during the floor debate on House Bill 2 that the amendment that would
become article 5.07-1 would not preclude the use of non-OEM parts, so long as those parts
equaled or exceeded the original manufacturer's specifications. See Debate on Tex. H.B. 2 on
the Floor of the House, 72d Leg., R.S. (May 27, 1991) (tape available from House Committee
Coordinator's Office). Representative Cavazos explained, "What we're trying to prevent is that
insurance companies mandate to auto body shops that they use after-market parts." Id.
7. Proposed House Bill 2079 read:


(a) An insurer may not limit its coverage under a policy covering damage to
a motor vehicle by specifying the brand, type, kind, age, or condition of
parts or products that may be used to repair the vehicle, or otherwise
control or limit in any way, directly or indirectly, the brand, type, kind,
age, price, quality or condition of replacement parts or products for which
the insurer will compensate the insured, unless:


 (1) that limitation is clearly and prominently displayed on the face of
the policy or certificate in lieu of a policy; and


 (2) within three days after receiving notice of a claim, the insurer
serves actual notice of the limitation on the insured and lienholder,
if any, and on any appropriate repair facility.


(b) An insurer that fails to comply with the terms of this section may not limit,
directly or indirectly, the brand, type, kind, age, price, quality or condition
of parts or products that may be used to repair a damaged vehicle and shall
pay for the parts and products chosen by the insured. 


Tex. H.B. 2079, 72d Leg., R.S. (1991) (emphasis added).
8. In such a case, the insurer might be liable under some type of breach of contract,
Deceptive Trade Practices Act, or other Insurance Code violation; but as we indicated earlier, that
issue is not before us.



: January 6, 2000

Publish
1. The summary-judgment evidence in the record indicates that pressure to enact this legislation
originated with a group of independent glass contractors who complained that they were losing
business as a result of private "networking" arrangements made between insurance companies and
large windshield manufacturers. Pursuant to these arrangements, many insurers were entering
into exclusive contracts with windshield manufacturers and certain "preferred" independent shops
whereby the insurance companies would require policyholders to use only those specified shops
when having repairs made under their policies in return for the repair shops' pledge to use less
expensive aftermarket replacement parts.
2. As a practical matter, used, reconditioned, recycled, and salvaged OEM parts (collectively,
"used parts") are usually classified with non-OEM parts--notwithstanding the fact that they were
at one time new OEM parts. For purposes of this discussion, all references to non-OEM parts
should be deemed to refer to used parts as well.
3. A schedule included in the record indicates that from 1984 to 1994, State Farm saved over
$100 million each year by using non-OEM parts in adjusting its claims. Over that same ten-year
period, the schedule shows that State Farm saved a total of over $1.25 billion.
4. Appellants' argument is essentially that the insurers are prohibited from taking a credit--also
referred to as a "betterment"--in the event a replacement part makes the repaired vehicle more
valuable than it was in its pre-accident condition. See Great Tex. County Mut. Ins. Co. v. Lewis,
979 S.W.2d 72 (Tex. App.--Austin 1998, no pet.).
5. The Department of Insurance promulgates standard Texas personal automobile insurance
policy forms that specify the minimum coverage insurance companies must provide to their
policyholders in Texas. See Tex. Ins. Code Ann. art. 5.06 (West Supp. 2000).
6. Contrary to Berry and Dudney's assertion, the legislative history does not indicate any
intention to require insurers always to pay for the cost of new OEM parts when adjusting claims. 
In fact, Representative Cavazos, the sponsor of House Bill 2079 and one of the amendment's
supporters, commented during the floor debate on House Bill 2 that the amendment that would
become article 5.07-1 would not preclude the use of non-OEM parts, so long as those parts
equaled or exceeded the original manufacturer's specifications. See Debate on Tex. H.B. 2 on
the Floor of the House, 72d Leg., R.S. (May 27, 1991) (tape available from House Committee
Coordinator's Office). Representative Cavazos explained, "What we're trying to prevent is that
insurance companies mandate to auto body shops that they use after-market parts." Id.
7. Proposed House Bill 2079 read:


(a) An insurer may not limit its coverage under a policy covering damage to
a motor vehicle by specifying the brand, type, kind, age, or condition of
parts or products that may be used to repair the vehicle, or otherwise
control or limit in any way, directly or indirectly, the brand, type, kind,
age, price, quality or condition of replacement parts or products for which
the insurer will compensate the insured, unless:


 (1) that limitation is clearly and prominently displayed on the face of
the policy or certificate in lieu of a policy; and


 (2) within three days after receiving notice of a claim, the insurer
serves actual notice of the limitation on the insured and lienholder,
if any, and on any appropriate repair facility.


(b) An insurer that fails to comply with the terms of this section may not limit,
directly or indirectly, the brand, type, kind, age, price, quality or condition
of parts or products that may be used to repa