CENTRAL POWER AND LIGHT COMPANY, Appellant,

v.

John SHARP, Comptroller of Public Accounts of the State of Texas, and Dan Morales, Attorney General of the State of Texas, Appellees.

No. 03–95–00093–CV.

Court of Appeals of Texas, at Austin.

April 3, 1996.

Rehearing Overruled May 1, 1996.

David C. Duggins, Clark, Thomas & Winters, Austin, for Appellant.

Dan Morales Attorney General, Christine Monzingo, Assistant Attorney General, Taxation Division, Austin, for Appellees.

Before CARROLL, C.J., and JONES and B.A. SMITH, JJ.

BEA ANN SMITH, Justice.

The opinion issued by this Court on December 6, 1995 is withdrawn and the following opinion is substituted in its place.

Appellant Central Power and Light ("CP & L") appeals from a summary judgment rendered in favor of appellees ("the Comptroller"). The dispute centers around the Comptroller's interpretation of a provision within the Franchise Tax Act governing the computation of a company's surplus. *See* Tex.Tax Code Ann. §§ 171.001(a), 171.109(b) (West 1992). We will affirm the judgment of the trial court.

## Background

CP & L is a corporation organized under Texas law, subject to state regulation as an electric utility company. *See* Tex.Rev.Civ. Stat.Ann. art. 1446c, § 3(c)(1) (West Supp. 1995). As a corporation doing business in Texas, it is required to report and pay an annual franchise tax to the State. *See* Tex. Tax Code Ann. § 171.001 (West 1992 & Supp.1995). The franchise tax is one imposed on the value of the privilege of transacting business in Texas. *Bullock v. National Bancshares Corp.*, 584 S.W.2d 268, 270 (Tex.1979). The amount of tax due is based on the company's taxable capital, which consists of surplus and stated capital. Tex.Tax Code Ann. § 171.002 (West Supp.1995). Surplus is net assets, or total assets minus total debts. Code § 171.109 (West 1992 & Supp. 1995). The computation of surplus is governed by Tax Code section 171.109. That section provides in pertinent part that "a corporation must compute its surplus ... according to generally accepted accounting principles." Code § 171.109(b) (West 1992). The Comptroller has interpreted "generally accepted accounting principles" to include "those broad rules of accounting formally accepted by the American Institute of Certified Public Accountants (AICPA)...." 34 Tex.Admin.Code § 3.547(d)(1) (West 1995). The rules of accounting formally accepted by AICPA are set forth in the pronouncements of the Financial Accounting Standards Board ("FASB"); the individual rules are referred to as Financial Accounting Standards.

During the relevant time period, CP & L was involved in building the South Texas Nuclear Power Plant ("STNP"). A company's cost of financing a long-term construction project such as STNP is referred to as Allowance for Funds Used During Construction, or "AFUDC."

According to Financial Accounting Standard 34, all interest owed to lenders on amounts borrowed for construction purposes must be capitalized as an asset. This interest expense is known as AFUDC-debt. According to Financial Accounting Standard 71, a regulated utility that uses its own funds for construction purposes must capitalize the imputed cost of using those funds (for example, the foregone interest that could have been earned on the funds used for construction). This cost of using a company's own funds, or equity, is known as AFUDC-equity. Thus, for a regulated utility, the cost of acquiring capital, whether from an outside lender or from internal funds, is treated the same as the cost of acquiring nails, cement and construction labor: all are capitalized as an asset. Once the project is completed and placed in use, all capitalized costs are added to the cost basis of the project, and are then depreciated over the life of the structure.

### The Controversy

Because CP & L used its own funds to finance the nuclear plant, it capitalized its AFUDC-equity in its 1990 franchise tax report pursuant to Financial Accounting Standard 71 and paid its tax accordingly. CP & L then sought a refund of the difference between its tax as reported and paid, and its tax as it would have been computed without capitalizing its AFUDC-equity. *See* Tex.Tax Code Ann. § 111.104, .105 (West 1992). This difference amounted to approximately three million dollars. The Comptroller denied CP & L's request for a refund, maintaining that generally accepted accounting principles reflected in Financial Accounting Standard 71 required CP & L to capitalize its AFUDC-equity.

CP & L contends that Tax Code section 171.109(b) does not require it to capitalize its AFUDC-equity as an asset in computing its franchise tax, and attacks the Comptroller's interpretation to the contrary as unconstitutional. CP & L argues that the Comptroller's interpretation of Tax Code section 171.109(b) results in unequal taxation because it requires utilities to capitalize AFUDC-equity, but does not require private companies to do so. CP & L also claims that the Comptroller's interpretation of Tax Code section 171.109(b) forces it to compute franchise tax liability using the "books and records" method of accounting, a circumstance which this Court found to violate the state constitutional requirement that all taxes be equal and uniform. *See* Tex. Const. art. VIII, § 1; *Bullock v. Sage Energy Co.*, 728 S.W.2d 465, 468 (Tex.App.—Austin 1987, writ ref'd n.r.e.). Finally, CP & L asserts that the Comptroller's reliance on FASB pronouncements as "generally accepted accounting principles" results in an unconstitutional delegation of legislative power to an unofficial agency. *See* Tex. Const. art. III, § 1.

### Discussion and Holding

CP & L contends in its third point of error that the Comptroller's interpretation of "generally accepted accounting principles" to comprise Financial Accounting Standards results in tax classifications that afford disparate treatment to similarly situated taxpayers. *See* Tex.Tax Code Ann. § 171.109(b) (West 1992); 34 Tex.Admin.Code § 3.547(d)(1) (West 1995). Financial Accounting Standard 71 provides that regulated companies must capitalize AFUDC-equity, while Financial Accounting Standard 34 does not require non-regulated companies to capitalize AFUDC-equity. CP & L argues that because there is no rational basis justifying this disparate treatment, the Comptroller's interpretation runs afoul of the state constitutional provision requiring equal and uniform taxation. *See* Tex. Const. art. VIII, § 1.

 Administrative rules are constitutional if they are consistent with the statute and are reasonable. *Bullock v. Hewlett–Packard*, 628 S.W.2d 754, 756 (Tex.1982). CP & L essentially attacks the Comptroller's interpretation of Tax Code section 171.109(b) as unreasonable because it results in an unequal and non-uniform tax, in violation of the

state constitution. When an agency interpretation is in effect at the time the legislature amends the law without making substantial change in the statute, the legislature is deemed to have accepted the agency's interpretation. *Bullock v. Marathon Oil Co.,* 798 S.W.2d 353, 357 (Tex.App.—Austin 1990, no writ). The Comptroller's Franchise Tax Rule 3.547 was in effect when the legislature amended Tax Code section 171.109. *See* 34 Tex.Admin.Code § 3.547 (West 1995); Tex. Tax Code Ann. § 171.109 (West 1992 & Supp.1995). We therefore conduct our analysis as if the interpretation under attack were set forth by the legislature.

■ Tax classifications are constitutional unless there is no reasonable basis for the attempted classification. *Hurt v. Cooper,* 130 Tex. 433, 110 S.W.2d 896, 901 (1937). The party attacking the tax has the burden to show discrimination by negating every conceivable basis which might support it. *Marathon Oil Co.,* 798 S.W.2d at 359. We indulge a strong presumption of constitutional validity when reviewing statutes relating to taxation. *Vinson v. Burgess,* 773 S.W.2d 263, 266 (Tex.1989).

■ We begin our discussion by noting that "the legislature of the state has frequently placed public utilities within a class by themselves for the purpose of taxation." *State v. Southwestern Gas & Elec. Co.,* 145 Tex. 24, 193 S.W.2d 675, 678 (1946). The Comptroller advances this rational basis for the challenged tax classification: that regulated utilities, unlike private non-regulated enterprises, are substantially assured of recovering and earning a return on AFUDC-equity through the rate-making process. This Court has recognized that, once a constructed plant is placed in service, a utility can recover AFUDC-equity by adding it as a cost of construction to the utility's rate base. *City of El Paso v. Public Util. Comm'n,* 839 S.W.2d 895, 912–13 (Tex.App.—Austin 1992), *rev'd in part on other grounds,* 883 S.W.2d 179 (Tex.1994). Furthermore, Financial Accounting Standard 71 provides for the capitalization of AFUDC-equity only upon CP &

L's determination that the AFUDC-equity would probably be included as a cost in its rate base.[1] AFUDC-equity is valuable to CP & L and improves its true financial condition because it is repaid through rates.

Unlike regulated companies, non-regulated enterprises do not enjoy this high probability that a return will be realized on their AFUDC-equity; they must depend on market forces for any such return. AFUDC-equity therefore does not represent the same value for a non-regulated company as it does for a regulated company. The Comptroller's rule at issue here does nothing more than recognize and account for this difference. We conclude that this difference in value provides more than sufficient justification for the disparate treatment of AFUDC-equity between regulated and non-regulated companies.

CP & L urges that because regulated companies are not always allowed to recover costs incurred in the construction of major plants, the tax does not operate equally within the class. We disagree. When the Public Utility Commission fails to find that utility construction costs are prudent, the Commission may disallow the inclusion of those costs in the utility's rate base. *See, e.g., El Paso v. Public Util. Comm'n,* 883 S.W.2d 179, 186 (Tex.1994); *Gulf States Utils. v. Coalition of Cities,* 883 S.W.2d 739, 743 n. 2 (Tex.App.—Austin 1994, no writ). This is because "[i]t is neither just nor reasonable for a utility's customers to bear the cost of inefficient management or poor planning." *Coalition of Cities,* 883 S.W.2d at 743 n. 2 (citing *Long Island Lighting Co. v. Public Serv. Comm'n of the State of New York,* 134 A.D.2d 135, 523 N.Y.S.2d 615 (1987)). The disallowance of AFUDC-equity on this basis has nothing to do with the inherent value that AFUDC-equity represents to the company; it is simply a means of protecting ratepayers from the financial consequences of a utility's poor decision-making. This does not change the distinguishing feature that a regulated utility's rates are cost-based and not subject to market pricing. Any likelihood that a regu-

---

1. Indeed, in its response to interrogatories, CP & L stated that the Public Utility Commission "sometimes allows a utility to recover all or a portion of the AFUDC that is capitalized during a construction period."

lated company's AFUDC-equity will not yield a return on the basis of imprudence is attributable to the improper decisions of the company itself. A tax classification that reasonably discriminates between regulated and non-regulated companies does not lose its rationality when it fails to take into account a variable largely in control of the company itself.

CP & L also contends that the tax classification is unreasonable because of recently passed legislation which affects regulated companies. The statute states in part:

> The legislature finds that public utilities are by definition monopolies in many of the services they provide and in many of the areas they serve, and that therefore *the normal forces of competition* that operate to regulate prices in a free enterprise society *do not always operate,* and that therefore utility rates, operations, and services are regulated by public agencies where competition does not operate, with the objective that *this regulation shall operate as a substitute for competition.*

Act of May 12, 1995, 74th Leg., R.S., ch. 765, art. 2, § 2.001, Tex.Gen.Laws 3972, 3988–89 (West Supp.1995) (emphasis added). This bill maintains regulatory pricing as a substitute for market-based pricing in most cases. It therefore does not defeat the rational basis for the tax classification at issue—regulated companies still enjoy a far greater likelihood that they will realize a return on their AFUDC-equity because of cost-based rate setting.

■ CP & L next argues that the classification results in unequal taxation because companies performing services under cost-reimbursement contracts are not required to capitalize AFUDC-equity in computing their franchise tax. Thus, CP & L argues, these companies and regulated enterprises are similarly situated with respect to AFUDC-equity, but the classification treats them differently. We are not persuaded by this argument. First, the probability that such a company will recover its AFUDC-equity depends on the operation of a contract, while a regulated company's likelihood of recovery is substantially assured by operation of law. See Tex.Civ.Stat.Ann. art. 1446c, § 39 (West

Supp.1995). This distinction alone would provide a reasonable basis for requiring regulated companies to capitalize AFUDC-equity, while not imposing the same requirement on companies operating under cost-reimbursement contracts. *See Fairmont Dallas Restaurants, Inc. v. McBeath,* 618 S.W.2d 931, 933 (Tex.Civ.App.—Waco 1981, no writ) (if any reasonable distinction can be found, court must sustain tax classification). Second, CP & L has not offered any proof that this challenged classification has been *applied* to a large class of companies operating under cost-reimbursement contracts. *See Southern Clay Prods. Inc. v. Bullock,* 753 S.W.2d 781, 784 (Tex.App.—Austin 1988, no writ) (to warrant court intervention under Texas Constitution article VIII, section 1 in a tax assessment, complaining party must show challenged rule as construed by taxing authority has been applied to large class of other individuals).

CP & L offers as a final argument that the tax is unequal because a regulator cannot value a regulated company's AFUDC-equity with any greater accuracy than an unregulated company could value its AFUDC-equity. CP & L asserts that a regulator's valuation is necessarily arbitrary because it is based upon estimates and derived by using any one of several economically-based algorithms. This argument ignores the fact that the classification is based on the recognition that AFUDC-equity, whatever its specific value, represents a benefit to the company because that value will be recovered through the rate-making process. The determined value of AFUDC-equity as capitalized for purposes of the franchise tax will equal the value added to the company's rate base.

We hold this disparate tax treatment of regulated and non-regulated enterprises does not violate the Texas Constitution, and we overrule CP & L's third point of error.

■ CP & L contends in its second point of error that the Comptroller's interpretation of "generally accepted accounting principles" in Tax Code section 171.109(b) resurrects the Comptroller's former "books and records" rule, which we held to violate our Constitution's prohibition against unequal taxation.

*See Bullock v. Sage Energy Co.,* 728 S.W.2d 465 (Tex.App.—Austin 1987, writ ref'd n.r.e.). In that case, Sage attacked the Comptroller's rule which required a corporation to compute its franchise tax based on its financial condition as shown in its books and records of account. *Id.* at 465. Because Sage's shares were publicly traded, the Securities and Exchange Commission required it to capitalize its intangible drilling costs on its books and records. Under the Comptroller's rule, Sage was accordingly required to capitalize its intangible drilling costs for purposes of computing its franchise tax liability. Corporations whose shares were not publicly traded were not subject to this Securities and Exchange Commission regulation; they were able to treat intangible drilling costs as expenses on their books and records, and accordingly excluded those expenses from their taxable capital in computing their franchise tax liability.

This Court concluded that although intangible drilling costs have the same value to all corporations, their value was ascertained by different standards under the Comptroller's "books and records" rule. *Id.* at 468. Sage's intangible drilling costs were capitalized at full value, while these same costs for similar corporations were not capitalized at all, simply by virtue of the accounting method employed by the corporation. *Id.* "Accordingly, Sage was denied the right to equal and uniform taxation provided by the Constitution." *Id.* Sage dealt with a rule which essentially imposed a different "value" on costs which held the same actual value to all parties subject to the rule. As previously discussed, AFUDC-equity does not hold the same value for unregulated companies as it does for regulated companies. The tax classification assailed by CP & L here does nothing more than recognize that difference. We overrule CP & L's second point of error.

CP & L asserts in its first point of error that the Comptroller's interpretation of "generally accepted accounting principles" in Tax Code section 171.109(b) as including pronouncements by the Financial Accounting Standards Board violates the state constitutional prohibition against delegating legislative power to authority outside the legislature. *See* Tex. Const. art. III, § 1; Tex.Tax Code Ann. § 171.109(b) (West 1992); 34 Tex.Admin.Code § 3.547(d)(1) (West 1995). In its cross-point of error, the Comptroller urges that this claim is jurisdictionally barred because CP & L failed to raise it in its motion for rehearing before the Comptroller. *See* Tex.Tax Code Ann. § 112.152 (West 1992). We must address the Comptroller's claim first.

 In a tax refund action, the Tax Code provides the exclusive waiver of sovereign immunity. *Hammerman & Gainer, Inc. v. Bullock,* 791 S.W.2d 330, 331 (Tex. App.—Austin 1990, no writ); *Bullock v. Marathon Oil Co.,* 798 S.W.2d 353, 360 (Tex. App.—Austin 1990, no writ). Thus in order to maintain an action against the Comptroller for a refund of taxes, a party must meet the procedural requirements of the tax protest law. *Marathon Oil,* 798 S.W.2d at 360. Compliance with these procedures is a jurisdictional prerequisite for the trial court to hear and decide the merits of a tax refund suit. *See Robinson v. Bullock,* 553 S.W.2d 196, 198 (Tex.Civ.App.—Austin 1977, writ ref'd n.r.e.), *cert. denied,* 436 U.S. 918, 98 S.Ct. 2264, 56 L.Ed.2d 759 (1978).

 Tax Code section 112.152 provides that the "grounds of error contained in the motion for rehearing are the only issues that may be raised in a suit" seeking a refund of taxes paid. Tex.Tax Code Ann. § 112.152 (West 1992). CP & L failed to include its delegation argument in the motion for rehearing, and so cannot raise it in its action for a refund. The Tax Code procedures for seeking a refund "created a right not existing at common law and prescribed a remedy to enforce the right; therefore the courts may act only in the manner provided by the statutes which created the right." *Robinson,* 553 S.W.2d at 197 (citing *Union Central Life Insurance Co. v. Mann,* 138 Tex. 242, 158 S.W.2d 477, 481 (1941)). We accordingly hold that the trial court erred in denying the Comptroller's plea to the jurisdiction on CP & L's delegation argument. The Comptroller's cross-point of error is sustained.

Were we to reach appellant's delegation complaint, we would overrule it on the mer-

its. The legislature has delegated to the Comptroller the power to adopt rules for the enforcement and collection of the franchise tax. Tex.Tax Code Ann. § 111.002(a) (West 1992); *see In re Johnson,* 554 S.W.2d 775, 779–80 (Tex.Civ.App.—Corpus Christi 1977), *writ ref'd n.r.e.,* 569 S.W.2d 882, 883 (Tex. 1978) (legislature may delegate duty to administer and enforce legislative functions). This delegation of power is particularly appropriate where, as here, "the legislature itself cannot practically and efficiently exercise the power" it has delegated. *In re Johnson,* 554 S.W.2d at 780. The Comptroller's adoption of Franchise Tax Rule 3.547, interpreting "generally accepted accounting principles" in the Franchise Tax Act, falls within this delegated authority.

CP & L does not attack the power delegated by the legislature to the Comptroller; instead it claims that the Comptroller's interpretation of "generally accepted accounting principles" confers legislative power onto FASB. As previously noted, the legislature is deemed to have accepted this interpretation. *Marathon Oil Co.,* 798 S.W.2d at 357. CP & L argues that this interpretation, which allegedly renders the statute unconstitutional, must be rejected in favor of one consistent with the constitution.

Tax Code section 171.109(b) states:

Except as otherwise provided in this section, a corporation must compute its surplus, assets, and debts according to generally accepted accounting principles. If generally accepted accounting principles are unsettled or do not specify an accounting practice for a particular purpose related to the computation of surplus, assets, or debts, the comptroller by rule may establish rules to specify the applicable accounting practice for that purpose.

Tex.Tax Code Ann. § 171.109(b) (West 1992). The Comptroller has interpreted "generally accepted accounting principles" to mean, "unless the context clearly requires otherwise, those broad rules of accounting formally accepted by the American Institute of Certified Public Accountants (AICPA) or its designees...." 34 Tex.Admin.Code § 3.547(d)(1) (West 1995).

■ This Court has approved the delegation of legislative authority to private entities when the legislative purpose is discernible and there is protection against the arbitrary exercise of the entity's power. *Public Ins. Counsel v. Texas Auto. Ins. Plan,* 860 S.W.2d 231, 237 (Tex.App.—Austin 1993, writ denied); *see also Oxford v. Hill,* 558 S.W.2d 557, 560 (Tex.Civ.App.—Austin 1977, writ denied) (legislature may delegate authority to establish rules to carry out express purpose of law in question). However, FASB operates without reference to any legislative purpose, and it does not make its pronouncements in order to fulfill or effectuate any statute. Nor does FASB exercise any direct power or authority over Texans; its pronouncements are effective only by virtue of legislative action adopting them as accounting standards.

In addition to FASB's lacking any legislative power, numerous protective mechanisms insure that Financial Accounting Standards are not unconditionally binding on taxpayers. According to the same interpretive rule assailed by CP & L, Financial Accounting Standards are not to be used when "the context clearly requires otherwise." 34 Tex.Admin.Code § 3.547(d)(1) (West 1995). Indeed, evidence in the administrative record reflects that the Rules of Ethics for Certified Public Accountants require a departure from generally accepted accounting principles when compliance with the principle would result in a misleading financial statement. Furthermore, any danger that Financial Accounting Standards will work harm or unfairness on taxpayers is removed by procedures through which a taxpayer may go before the Comptroller to contest the imposition of the tax. *See* Tex.Tax Code Ann. § 111.104, .105 (West 1992) (outlining procedures for taxpayer to seek refund from comptroller). These procedures also demonstrate that the Comptroller, not FASB, holds and exercises the properly delegated power to interpret and apply tax laws.

Based on these considerations, we would hold that the contested interpretation of Tax Code section 171.109(b) does not confer any legislative power on FASB; the interpretation simply incorporates the Board's pro-

nouncements as standards to be used in computing taxes under the laws set forth in the Franchise Tax Act. The supreme court has approved the legislature's incorporation of standards promulgated by an unofficial agency into statutes. *Texas Workers' Compensation Comm'n v. Garcia*, 893 S.W.2d 504, 522 (Tex.1995); *Dudding v. Automatic Gas & Co.*, 145 Tex. 1, 193 S.W.2d 517, 520 (1946).

In light of these same considerations, we disagree with CP & L's contention that the legislature's incorporation of future pronouncements by FASB bestows legislative authority on that body. In *Garcia*, the court dealt with the incorporation of the American Medical Association's *Guides to the Evaluation of Permanent Impairment* (the *"Guides"*) into the Texas Workers' Compensation Act. *Garcia*, 893 S.W.2d at 521, 525. The legislature adopted a particular edition of the *Guides* as the basis for rating "impairments" under the Act, as part of an effort to provide more objectivity in determining long-term compensation awards. *Id.* at 522–523, n. 12., 526. In upholding the use of the *Guides'* standards against a due-course-of-law challenge, the court suggested that the specification of a particular edition of the *Guides* "creates a potential administrative problem." *Id.*

The legislature in the Franchise Tax Act directed taxpayers to employ "generally accepted" principles in computing their tax liability; it did not freeze these principles in time. Nor did the legislature, in implicitly accepting the Comptroller's interpretation, incorporate a particular edition of FASB pronouncements into the Franchise Tax Act. Thus, the legislature avoided the "potential administrative problem" identified in *Garcia*. Given the Comptroller's ongoing oversight of the application of these Standards, we do not see how the incorporation of future Standards provides any basis—other than that we have already disposed of—for the proposition that FASB wields any legislative power.

Having overruled CP & L's points of error, we affirm the judgment of the trial court.