# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00436-CV

**Texas Medical Association; Texas AFL-CIO; Patient Advocates of Texas; Allen J. Meril, M.D.; and L. E. Richey, Appellants**

**v.**

**Texas Workers Compensation Commission; Richard F. Reynolds, Executive Director; and Texas Association of Business, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT NO. GN202203, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING

## O P I N I O N

This case concerns allegations by the Texas Medical Association, the Texas AFL-CIO, Patient Advocates of Texas, and Doctors Allen J. Meril and L.E. Richey (collectively, the appellants),[1] that the 2002 medical fee guidelines promulgated by the Texas Workers Compensation Commission are invalid. *See* 28 Tex. Admin. Code § 134.202 (2003). Appellants assert substantive and procedural challenges to the Commission's rule establishing the 2002 fee guidelines. For the reasons that follow, we affirm the judgment of the district court declaring the 2002 fee guidelines valid and denying a permanent injunction to restrain the guidelines' implementation.

---

[1] When their interests diverge, we will refer to the appellants individually.

**BACKGROUND**

In 2001, the Texas Legislature amended section 413.011 of the labor code to require the Commission to revamp its medical reimbursement policies and guidelines relating to the workers' compensation program. *See* Act of May 25, 2001, 77th Leg., R.S., ch. 1456, § 6.02, sec. 413.011, 2001 Tex. Gen. Laws 5167, 5184 (codified at Tex. Lab. Code Ann. § 413.011 (West Supp. 2004)). The new statute imposed upon the Commission the duty to adopt entirely new guidelines for reimbursement to be paid to medical-care providers participating in the workers' compensation program. Tex. Lab. Code Ann. § 413.011 (West Supp. 2004). The statute directed the Commission to use the "most current reimbursement methodologies, models, and values or weights" used by the federal Centers for Medicare and Medicaid Services (CMS)[2] in an effort to achieve standardization among various health-care delivery systems, with "minimal modifications . . . as necessary to meet occupational injury requirements." *Id.* As its reimbursement "methodology," the CMS employs a mathematical formula that assigns relative values to specific medical services, adjusts those values based upon geographic differences, and converts the relative values into dollar amounts—using the so-called "conversion factor"—to arrive at the reimbursement payment.[3]

---

[2] The CMS was previously known as the Health Care Financing Administration (HCFA). We will use the current title throughout this opinion.

[3] That formula reads:

Payment = [RVU work × GPCI work] + [RVU practice expense × GPCI practice expense] + [RVU malpractice × GPCI malpractice] × conversion factor.

66 Fed. Reg. 55,248 (Nov. 1, 2001) (codified at 42 C.F.R. §§ 414.2, .20, .26).

The terms used in the formula stand for the following values: RVU is the relative value unit, which is a nationally uniform relative value assigned by the CMS to each service. There are three relevant RVUs: (1) an RVU for physician work, (2) an RVU for practice expenses, and (3) an RVU for malpractice expenses. GPCI is the geographic practice cost index. When multiplied by the RVUs,

2

After notice and comments, the Commission adopted rule 134.202, which directs that workers' compensation participants "shall apply the Medicare program reimbursement methodologies, models, values or weights . . . in effect on the date a service is provided." 27 Tex. Reg. 4048 (May 10, 2002) (codified at 28 Tex. Admin. Code § 134.202). Additionally, the rule provides that to determine the maximum allowable reimbursements for professional services, system participants shall apply the Medicare payment policies with the following modification: for certain service categories (*i.e.*, evaluation and management, general medicine, physical medicine and rehabilitation, surgery, radiology, and pathology), the conversion factor will be the "effective conversion factor adopted by CMS multiplied by 125%." 28 Tex. Admin. Code § 134.202(c).

In July 2002, the Texas AFL-CIO and the Texas Medical Association filed a suit seeking to declare the 2002 fee guidelines invalid because the Commission (1) had improperly delegated its duty to develop the conversion factor to the CMS; (2) had not provided a reasoned justification for the rule as required by the administrative procedure act (APA); (3) had not consulted the Medical Advisory Committee[4] in developing the conversion factor; and (4) had violated the statute by adopting the CMS's conversion factor without considering whether it met the statutory mandates to ensure fair and reasonable rates, quality care, and effective cost control. The appellants also sought a temporary injunction restraining the Commission from enforcing the 2002 fee

the GPCIs reflect the relative costs of practice expenses, malpractice insurance, and physician work in a particular area compared to the national average for each component. The conversion factor converts the relative values into payment amounts. *See id.*

[4] The Medical Advisory Committee is composed of numerous members, all appointed by the Commission, representing various interest groups (*i.e.*, health care facilities, doctors, medical-equipment suppliers, employers, employees, insurance carriers, and the general public). *See* Tex. Lab. Code Ann. § 413.005(b) (West Supp. 2004).

3

guidelines. The district court held a hearing on the request for a temporary injunction in August 2002. The court issued a temporary injunction and remanded the rule to allow the Commission to revise its preamble to make it substantially comply with the reasoned-justification requirement.[5]

The Commission adopted a "Supplemental Preamble" on December 12, 2002. *See* 27 Tex. Reg. 12,304-12,349 (Dec. 27, 2002) (hereinafter Supp. Preamble). On that date, the Commission also readopted the 2002 fee guidelines, with no textual changes to the rule. *See id.* 12,349. The Supplemental Preamble exceeded over forty dual-column pages in the Texas Register. In it, the Commission labored to "connect the dots," as the district court had instructed it, to explain how it arrived at the 125% conversion factor.

In April 2003, the district court held another hearing, this time on the appellants' request for a permanent injunction and on the merits of the rule's validity. After hearing evidence and argument, the court determined that the Commission's Supplemental Preamble substantially complied with the reasoned-justification requirement and issued an order declaring the 2002 fee guidelines valid in all respects, effective August 1, 2003. The appellants filed a motion for rehearing, which the district court denied. The appellants then brought this appeal, reasserting their arguments urged to the district court.

---

[5] The court's order remanded the rule to the Commission, pursuant to government code section 2001.040, so that "it may either revise or readopt the rule through established procedure." *See* Tex. Gov't Code Ann. § 2001.040 (West Supp. 2004). The court's order also noted: "based on the evidence adduced at the hearing, the Court is unable to conclude that the facts and data necessary to provide a reasoned justification for the rule are now in existence."

4

## DISCUSSION

### *Substantive challenges*

#### A. Delegation of power

In issues one and two, appellants assert that the Commission unlawfully and unconstitutionally delegated to a federal agency (the CMS) its responsibility to develop the conversion factor. *See* Tex. Lab. Code Ann. § 402.068 (West 1996) ("Except as expressly provided by this subchapter, the [C]ommission may not delegate rights and duties imposed on it by this subchapter."), § 413.011 (West Supp. 2004) ("[T]he [C]ommission shall also develop conversion factors or other payment adjustment factors taking into account economic indicators in health care and the requirements of Subsection (d). . . . This section does not adopt the Medicare fee schedule, and the [C]ommission shall not adopt conversion factors or other payment adjustment factors based solely on those factors as developed by the federal [CMS].").

Next, appellants argue that the delegation violates article III, section 1 of the Texas Constitution. *See* Tex. Const. art. III, § 1 (legislative power is vested solely in Texas Senate and House of Representatives); *Proctor v. Andrews*, 972 S.W.2d 729, 733 (Tex. 1998) (constitution generally prohibits delegation of legislative power to private entities); *Ex parte Elliott*, 973 S.W.2d 737, 741 (Tex. App.—Austin 1998, pet. ref'd) (if federal agency has authority to change Texas law without intervention of legislature, constitutionality of statute would be in doubt).

We must first determine whether the Commission has delegated its duty to develop the conversion factor to the CMS. The 2002 fee guidelines provide that fees for certain services are to be calculated by using the "effective conversion factor adopted by CMS multiplied by 125%." 28 Tex. Admin. Code § 134.202(c)(1). The rule also provides that "[w]henever a component of the

5

Medicare program is revised and effective, use of the revised component shall be required for compliance with [C]ommission rules . . . for services rendered on or after the effective date of the revised component." *See id.* § 134.202(a)(5). The initial preamble to the rule noted that the requirement to use revised Medicare components "include[s] Medicare revisions to the conversion factor." *See* 27 Tex. Reg. 4048-4121 (May 10, 2002) (hereinafter Preamble). Thus, appellants assert that because the Texas conversion factor differs by a mere percentage from the current CMS factor, the Texas conversion factor will "automatically" change whenever the CMS factor changes. Such an automatic adjustment to the Texas conversion factor will happen solely at the behest of the CMS, independently of the Commission. They cite this as evidence that the Commission has delegated its duty to develop a conversion factor, ignoring the statutorily mandated factors. We disagree.

The new statute commands the Commission to first "adopt the most current reimbursement methodologies, models, and values or weights used by the federal [CMS]." Tex. Lab. Code Ann. § 413.011(a). In other words, the Commission must begin its task of developing fee guidelines with the mathematical formula used by the CMS. *See* 66 Fed. Reg. 55,248 (Nov. 1, 2001). Then, the statute commands the Commission to adjust that formula to accomplish fair and reasonable guidelines: "[the Commission shall] develop conversion factors or other payment adjustment factors taking into account economic indicators in health care and the requirements of Subsection (d) [guidelines are to be fair and reasonable and designed to ensure quality of medical care and achieve effective medical cost control]." *See* Tex. Lab. Code Ann. § 413.011(a). In developing such conversion factors, "the [C]ommission shall not adopt conversion factors or other payment adjustment factors based solely on those factors as developed by the federal [CMS]," and the statute "does not adopt the Medicare fee schedule." *Id.* Thus, the statute merely prohibits the

6

Commission from adopting a Texas conversion factor based on nothing other than the Medicare factor. The Supplemental Preamble alone is replete with evidence of the Commission's consideration of other factors, such as workers' access to care, effective cost control, quality care, and fairness.

The Supplemental Preamble notes the importance of using the effective Medicare conversion factor:

> To achieve standardization, it is necessary to use the Medicare billing and reimbursement policies as they are modified by the CMS. Adoption of policies in effect on a particular date would require participants in the Texas workers' compensation system to bill and reimburse in a manner different from the current Medicare system and other healthcare reimbursement systems. That would undermine or eliminate the positive impact of the standardization required by the statute, including reduced administrative costs as discussed in the April 2002 preamble and the Supplemental Preamble. Therefore, the rule, in compliance with the statute, requires the use of the Medicare policies in effect on the day that a service is provided. [28 Tex. Admin. Code] § 134.202(a)(5).

Supp. Preamble 12,311. We cannot conclude that because the Texas conversion factor "automatically" self-adjusts with every change in the federal CMS conversion factor, the Commission has delegated its duty to develop a conversion factor to the CMS. As indicated in the initial and supplemental preambles, the Commission's decision to set the Texas conversion factor at a particular percentage of the effective Medicare factor was based on the balancing of several interests and factors: reducing medical costs, achieving standardization among different healthcare-reimbursement systems, taking into account specific requirements of the workers' compensation system and its administration, and addressing the other statutorily mandated factors in section 413.011. *See generally* Supp. Preamble. The Commission considered studies, reports, facts, and

7

other evidence to conclude that setting the conversion factor at 125% of the Medicare factor accomplishes all of its sometimes conflicting duties. The Commission did not omit consideration of these factors or delegate consideration to the CMS.

Furthermore, the Supplemental Preamble to the fee-guidelines rule states,

> The Commission will monitor any future changes in Medicare fee levels and effects on access to medical care closely. In response to any future Medicare fee changes, the Commission will promptly make appropriate changes, up or down, in the premium above Medicare that it sets for Texas workers' compensation fee levels if it determinates this is needed under the Texas statutory standards.

*Id.* 12,335. Changes to the Medicare conversion factor are historically announced several months before they become effective. *See, e.g.*, 42 C.F.R. § 414.4 (2003) (CMS announces proposed changes in Federal Register and provides opportunity for public comments prior to publication of final changes); 67 Fed. Reg. 79,966 (Dec. 31, 2002) (2003 conversion factor published on December 31, 2002, to be effective on March 1, 2003). Thus, the Commission will have an opportunity to make any necessary changes to the Texas multiplier prior to the date the Medicare conversion factor becomes effective. Indeed, the Commission has already adjusted the Texas conversion factor to 125%, up from 120%, after the Medicare conversion factor for 2002 was reduced. Supp. Preamble 12,335; *see also* 66 Fed. Reg. 55,320 (Nov. 1, 2001). Even without the Commission's statement in the Supplemental Preamble, the Commission has the ongoing statutory duty to review and revise the fee guidelines to ensure they are in compliance with the statutory factors. *See* Tex. Lab. Code Ann. § 413.012 (Commission is to review and revise guidelines *at least* every two years). Appellants' contention that the adjustment to the Texas conversion factor is "automatic" is thus overstated. The

8

Commission will have the ultimate authority, and the ongoing duty, to make adjustments to the Texas conversion factor to keep it reflective of the mandatory statutory factors.

This case is analogous to other delegation cases where this Court has determined that no unconstitutional delegation has occurred. *See Ray v. Texas State Bd. of Pub. Accountancy*, 4 S.W.3d 429, 431-33 (Tex. App.—Austin 1999, no pet.) (comptroller's rule incorporating, when applicable, "generally accepted auditing standards" of American Institute of Certified Public Accountants not delegation because comptroller retained discretion to interpret and apply standards on case-by-case basis); *Central Power & Light Co. v. Sharp*, 919 S.W.2d 485, 492-94 (Tex. App.—Austin 1996) (comptroller's rule defining "generally accepted accounting principles" to mean those principles adopted by American Institute of Certified Public Accountants was not delegation of power to private entity because Institute lacked direct authority over Texans, and there were safeguards to ensure that no wholesale delegation had occurred), *writ denied*, 960 S.W.2d 617 (Tex. 1997) (per curiam); *but see Elliott*, 973 S.W.2d at 741 (construction of statute that would mean Texas definition of hazardous waste changes each time federal Environmental Protection Agency [EPA] changes its definition would "place in doubt" constitutionality of statute, but court did not reach delegation question, instead construing statute to adopt EPA's definition at fixed point in time). In *Central Power & Light*, for example, we considered whether the incorporation of "future pronouncements" of definitions by a private entity bestowed legislative authority on that body. We concluded that in light of the comptroller's ongoing oversight of the application of those standards, there was no basis to conclude that the entity wielded any legislative power. 919 S.W.2d at 493. Similarly, here the Commission has the authority to revise its conversion factor upon each CMS adjustment and, indeed, it must revise the factor on a continuing basis to ensure that it is fair and

9

reasonable. We note also that the CMS has "no direct power or authority over Texans." *See id.* at 492. We hold that the Commission has not delegated its duty to develop the Texas conversion factor to the federal CMS. Because there has been no delegation, we need not reach appellants' arguments that the delegation was prohibited by statute or was unconstitutional. We overrule appellants' first and second issues.

## B. Arbitrary and capricious

Appellants' next substantive challenge is that the 2002 fee guidelines are arbitrary and capricious because they lack a legitimate factual or legal basis. *See Bullock v. Hewlett-Packard Co.*, 628 S.W.2d 754, 757 (Tex. 1982); *McCarty v. Texas Parks & Wildlife Dep't*, 919 S.W.2d 853, 854-55 (Tex. App.—Austin 1996, no writ). An agency acts arbitrarily if in making a decision it (1) omits from its consideration a factor that the legislature intended the agency to consider in the circumstances, (2) includes in its consideration an irrelevant factor, or (3) reaches a completely unreasonable result after weighing only relevant factors. *Reliant Energy, Inc. v. Public Util. Comm'n*, 62 S.W.3d 833, 841 (Tex. 2001); *McCarty*, 919 S.W.2d at 854.

Appellants correctly note the factors the Commission was statutorily required to consider in promulgating its fee guidelines: whether they are fair and reasonable, ensure the quality of medical care, and achieve effective medical cost control. Tex. Lab. Code Ann. § 413.011(d). Appellants assert that by tying the conversion factor to the current CMS conversion factor, the Commission's rule violates the first and second *Reliant* tests—in annually adjusting its conversion factor, the CMS does not take into account the three mandatory Texas requirements, while the CMS

10

does consider federal-budget neutrality, an irrelevant requirement under the statute. *See Reliant*, 62 S.W.3d at 841.

Because the Commission did not delegate its duty to set the Texas conversion factor to the CMS, we conclude that its adoption of the 125% multiplier to the CMS conversion factor was not arbitrary and capricious. The initial and supplemental preambles contain ample evidence of the Commission's consideration of the mandatory statutory factors in setting the conversion factor at a particular percentage of the Medicare factor. Also, we have found nothing in the record indicating that the Commission included federal-budget neutrality considerations in deciding to set the conversion factor as it did. Although the Medicare conversion factor may be periodically adjusted based partly on federal-budgetary constraints, the Commission retains the power to make its own adjustments to the federal factor, as necessary to meet the Texas statutory requirements. Indeed, it *must* make revisions to the conversion factor at least every two years to reflect fair and reasonable fees. *See* Tex. Lab. Code Ann. § 413.012. Although the CMS may change the Medicare conversion factor in part to comply with budgetary constraints, the Commission can and must adjust its conversion factor so that it continues to fulfill the statutory mandates. *See id.*; Supp. Preamble 12,335. We conclude that the Commission's 2002 fee guidelines are not arbitrary and capricious because in promulgating them, the Commission ably considered the legislatively mandated factors and did not consider the "irrelevant" factor of federal budgetary constraints.

At oral argument and in a post-submission brief, the appellants asserted that their third issue also challenges the substantive validity of the 2002 fee guidelines on constitutional

11

grounds. However, they did not present this argument in their pre-submission briefs.[6] All waivable

errors not included in the original appellate brief are waived and present nothing for review. *Hinkle*

*v. Adams*, 74 S.W.3d 189, 195 (Tex. App.—Texarkana 2002, no pet.) (citing *Pat Baker Co. v.*

*Wilson*, 971 S.W.2d 447, 450 (Tex. 1998)); *see* Tex. R. App. P. 38.1(e). Because the appellants

failed to raise this argument in their pre-submission briefs, the argument is waived. *See City of*

*Houston Precast Structures, Inc.*, 60 S.W.3d 331, 340 n.4 (Tex. App.—Houston [14th Dist.] 2001,

pet. denied). We overrule appellants' third issue.

## C. Statutory authority

Dr. Richey alone brings the following issue: "The trial court's determination that the

[2002 fee guidelines are] valid is erroneous because the [Commission] did not have statutory

authority to adopt the [2002 fee guidelines] in [their] current form." To support this argument, Dr.

Richey rehashes the appellants' argument that the Commission merely adopted the Medicare

conversion factor without taking into consideration the mandatory statutory factors. *See* Tex. Lab.

Code Ann. § 413.011(b). Dr. Richey specifically contends that the Commission neither took into

account "economic indicators in health care" nor provided for "reasonable fees for the evaluation

and management of care." *See id.* § 413.011(b). Yet, the studies, data, and reports discussed in the

initial and supplemental preambles indicate that the Commission did consider "economic indicators."

---

[6] The only reference in appellants' briefs about the constitutionality of the 2002 fee guidelines appears in a citation to a legal standard relating to arbitrariness and capriciousness: "A rule that lacks a legitimate factual basis and/or legal basis is arbitrary and capricious and a *denial of due process*. *Bullock v. Hewlett-Packard Co.*, 628 S.W.2d 754, 757 (Tex. 1982); *McCarty v. Texas Parks & Wildlife Dep't*, 919 S.W.2d 853, 854-55 (Tex. App.—Austin 1996, no writ)." (Emphasis added.) Appellants have failed to adequately brief this complaint, and it is therefore waived. *Wilkinson v. Dallas/Ft. Worth Int'l Airport Bd.*, 54 S.W.3d 1, 18 (Tex. App.—Dallas 2001, pet. denied), *cert. denied*, 534 U.S. 1128 (2002).

*See* Preamble 4053-54; Supp. Preamble 12,307-310; 12,314-315; 12,319-320; 12,323-325; 12,334-336. Also, the Preamble notes that fees for the evaluation and management of care were increased under the 2002 fee guidelines because they had historically been reimbursed below the Medicare amounts. *See* Preamble 4062. For the reasons already discussed, we conclude that the Commission adequately took into account the statutory factors. We overrule Dr. Richey's issue.

### *Procedural challenges*

#### A. Medical Advisory Committee

Appellants assert that the fee guidelines are invalid because the Commission failed to consult the Medical Advisory Committee as the labor code requires. *See* Tex. Lab. Code Ann. § 413.005(a) (West Supp. 2004). That statute provides,

> The medical advisory committee advises the division [of Medical Review] in developing and administering the medical policies, fee guidelines, and utilization guidelines established under Section 413.011. The committee *shall advise* the [C]ommission or professional organization in the review and revision of medical policies and fee guidelines required under Section 413.012.

*Id.* (emphasis added). Section 413.012 provides that "the medical policies and fee guidelines shall be reviewed and revised at least every two years to reflect fair and reasonable fees and to reflect medical treatment or ranges of treatment that are reasonable or necessary at the time the review and revision is conducted." *Id.* § 413.012 (West 1996). Thus, the statute commands the committee to advise the Commission in the mandatory biennial reviews of fee guidelines; the statute does not make the same command with respect to the Commission's *initial* formulation of the fee guidelines under section 413.011. *See id.* § 413.005(a). The Commission, therefore, was not statutorily

13

required to consult the Medical Advisory Committee in promulgating the initial 2002 fee guidelines. We hold that the rule is not invalid based on the Commission's failure to consult the Medical Advisory Committee.

## B.   Reasoned justification

The appellants assert that, despite the Supplemental Preamble, the Commission's attempt to provide a reasoned justification for the 2002 fee guidelines still falls short. Appellants' main complaint is that the Supplemental Preamble does not explain *why* the information used by the Commission justifies reducing reimbursement to certain health-care providers, resulting in the 125% figure. They assert that the Commission has provided no "factual basis" for the fee guidelines. *See* Tex. Gov't Code Ann. § 2001.033(a)(1)(B) (West 2000).

An agency rule is voidable unless the agency adopts it in substantial compliance with the requirements of the APA, including the requirement of a reasoned justification. *Id.* § 2001.033(a)(1), § 2001.035(a) (West 2000). A reasoned justification must include "a summary of the factual basis for the rule as adopted which demonstrates a rational connection between the factual basis for the rule and the rule as adopted." *Id.* § 2001.033(a)(1).

To substantially comply with the reasoned-justification requirement, the four corners of the agency's final notice must present the agency's justification in a relatively clear, precise, and logical fashion. *Reliant*, 62 S.W.3d at 840. This Court has held that an agency's order substantially complies with the reasoned-justification requirement if it accomplishes the legislative objectives underlying the requirement and comes fairly within the character and scope of each of the statute's requirements in concise, specific, and unambiguous terms. *Patient Advocates of Tex. v. Texas*

14

*Workers Comp. Comm'n*, 80 S.W.3d 66, 73 (Tex. App.—Austin 2002, pet. granted) (citing *Methodist Hosps. v. Industrial Accident Bd.*, 798 S.W.2d 651, 657-59 (Tex. App.—Austin 1990, writ dism'd w.o.j.)). The APA was designed to compel an administrative agency to articulate its reasoning and, in the process, more thoroughly analyze its rules. *Id.* (citing *National Ass'n of Indep. Insurers v. Texas Dep't of Ins.*, 925 S.W.2d 667, 671-72 (Tex. 1996) (*NAII*)). Requiring an agency to demonstrate a rational connection between the facts before it and the agency's rule promotes public accountability and facilitates judicial review. *Id.*

We review a challenge to the reasoned-justification requirement under an "arbitrary and capricious" standard, with no presumption that facts exist to support an agency's order. *Reliant*, 62 S.W.3d at 840; *Texas Hosp. Ass'n v. Texas Workers' Comp. Comm'n*, 911 S.W.2d 884, 887 (Tex. App.—Austin 1995, writ denied). In applying an "arbitrary and capricious" test to agency rulemaking, we examine whether the agency's explanation of the facts and policy concerns relied on in adopting the rule demonstrates that the agency considered all the factors relevant to the objectives of the agency's delegated rulemaking authority and engaged in reasoned decision making. *Reliant*, 62 S.W.3d at 842 (citing *Railroad Comm'n v. ARCO Oil & Gas Co.*, 876 S.W.2d 473, 491 (Tex. App.—Austin 1994, writ denied)).

Appellants primarily insist that the "reasoned justification" does not indicate how or why the Commission arrived at the 125% figure to create the Texas conversion factor. Our review of the Supplemental Preamble, however, indicates ample reasoning to support the Commission's decision. In the Supplemental Preamble, the Commission explained that its staff determined that the conversion factor needed to be somewhere between 100 and 140% of the Medicare factor, as the 1996 fee guidelines produced reimbursements that were equivalent to 140% of the then-current

15

Medicare factor, and the legislature had directed the Commission to lower costs. *See* Supp. Preamble 12,312-314; 12,316. Thus, the Commission found that a legitimate means to achieve the statutory mandate of effective cost control was to lower the premium as far as would be consistent with the safety margin needed to cover the extra administrative expenses of the workers' compensation program and to provide access to care. *See id.* 12,337. The Commission's staff then prepared spreadsheets comparing the impact of various conversion factors between 100 and 140% of the Medicare factor on total medical costs and on different service categories. *See id.* 12,313. The Commission's Executive Director, Richard F. Reynolds, testified that his staff had allotted estimated 5% increments as important components of the Texas workers' compensation program, adding and subtracting these increments from a conversion factor of 100% of Medicare as was appropriate.[7]

The Supplemental Preamble explains why a single conversion factor, as opposed to multiple conversion factors, works best—the single factor will help prevent over-utilization of some services and under-utilization of others. *See id.* 12,327. With respect to meeting the statutory requirements that the fee schedule achieve quality of care and be fair and reasonable, the Commission cites studies and reports noting the extra administrative costs associated with a workers' compensation program to support its conclusion that 125% is an appropriate conversion factor. An independent study conducted by a physician, Dr. Mark Brinker, indicates that the extra expenses and burdens of a workers' compensation program would be adequately covered by a 125% conversion factor. *See id.* 12,328-329. A consulting firm, Pershing Yoakley & Associates, P.C., prepared a

---

[7] For example, an estimated 5% increment was added as an incentive to provide for the availability of quality care to injured workers, while an estimated 5% increment was subtracted due to the security of payment afforded by the workers' compensation commission. *See* 27 Tex. Reg. 12,316 (Dec. 27, 2002).

16

report that also indicated that a payment of 125% of Medicare would be more than sufficient to offset the additional administrative expenses. *See id.* 12,324.

The Commission cites surveys indicating that patients have generally not had access-to-care problems under the Medicare system; thus, reasons the Commission, patients will similarly have minimal problems under the workers' compensation program, which pays physicians more than Medicare. *See id.* 12,323; 12,335. A consulting company performed a study that concluded that at 109% of Medicare, there is no access-to-care problem. *Id.* 12,335-336. Also, the Commission cites reports and studies indicating that effective care is not necessarily equivalent to expensive care and states that no study has been found showing that paying higher fees provides higher quality care once access to care is obtained. *Id.* 12,314-315; 12,331-332. Thus, concluded the Commission, the 2002 fee guidelines adequately address the statutory mandates to ensure the quality of care yet achieve effective medical cost control.

Lastly, we note that the Commission was not required to demonstrate that 125% is the only reasonable or factually defensible policy alternative. Rather, it needed only to demonstrate that there is a rational connection between its conversion factor and the factual material it has received or otherwise considered, and that 125% is a legitimate and factually defensible choice that complies with the multiple statutory requirements of the labor code. *See NAII*, 925 S.W.2d at 669. The legislative objective of the reasoned-justification requirement is to give notice of the factual, policy, and legal bases for the rule, in light of all the evidence gathered by the agency and submitted by interested parties during the comment period. *Patient Advocates*, 80 S.W.3d at 74. The Commission's initial preamble, bolstered by its Supplemental Preamble, clearly and exhaustively explains the Commission's reasons for choosing a conversion factor that is a 125% multiplier of the

17

Medicare conversion factor. Under the "arbitrary and capricious" standard, we conclude that the Commission substantially complied with the reasoned-justification requirement of the APA.

## C. Public notice and comment

Appellants contend that after the district court remanded the 2002 fee guidelines to the Commission to comply with the reasoned-justification requirement, the Commission was required to provide public notice and a comment period upon publishing the Supplemental Preamble. *See* Tex. Gov't Code Ann. § 2001.040 (West Supp. 2004) ("[T]he court may remand the rule, or a portion of a rule, to the agency and, if it does so remand, shall provide a reasonable time for the agency to either revise or readopt the rule *through established procedure*." (emphasis added)). Appellants assert that "established procedure" required the Commission to publish a new notice of proposed rulemaking because the reasoning provided in the Supplemental Preamble was new and thus has never been subject to public notice and comment.

Although the order adopting a rule must contain the reasoned justification or factual basis for the rule, *see id.* § 2001.033, no statute requires the Commission to include that statement of the factual basis for the rule in the public notice of proposed rulemaking. *See id.* § 2001.024 (West 2000) (providing contents of public notice when agency proposes rule). Thus, failure to include in the notice of a proposed rule a statement of the factual basis that will support the rule as adopted cannot violate "established procedure," simply because there is no such established procedure.

In some cases, a new notice of rulemaking will be required if after initial publication, a proposed rule is amended so that it affects persons other than those originally put on notice.

18

*Patient Advocates*, 80 S.W.3d at 75; *State Bd. of Ins. v. Deffebach*, 631 S.W.2d 794, 801 (Tex. App.—Austin 1982, writ ref'd n.r.e.).  However, should the agency amend the proposed rule such that no one other than those previously given notice would be affected, no further purpose would be served by requiring republication of the proposed rule.  *Patient Advocates*, 80 S.W.3d at 75.  Because there was no change in the rule's text after the Commission added the Supplemental Preamble, the rule could not have affected any persons beyond those originally put on notice.  The publication of the initial preamble placed the same persons on notice regarding the same subject matter as did the publication of the Supplemental Preamble.  By drafting the Supplemental Preamble, the Commission did not ignore or substantially alter the proposed rule to an extent that a new or different group of persons was affected.  *See id.*  Therefore, we hold that a new period of notice and comment was not required in this case.  We overrule the appellants' fourth issue.

### TAB's standing

Dr. Richey separately challenges the TAB's standing in this matter for the first time on appeal.  The TAB counters that Dr. Richey waived any objection to TAB's intervention in this suit by not objecting below and obtaining a ruling.  *Jones v. Spring Ranch Co.*, 642 S.W.2d 551, 554 (Tex. App.—Amarillo 1982, no writ); *see also Guaranty Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex. 1990).  Dr. Richey rejoins that because standing is a component of subject-matter jurisdiction, it cannot be waived and may be raised for the first time on appeal.  *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993).  Although we agree with Dr. Richey that standing implicates subject-matter jurisdiction and that subject-matter jurisdiction may be raised at any time, *see id.*, the cases he cites pertain to whether a *plaintiff* has

19

standing to bring a cause of action. *See, e.g.*, *id.* at 446-47. Here, we have a different issue altogether: whether and under what circumstances a *defendant* may intervene. Thus, the standing analysis of *Texas Association of Business* is inapplicable, and we must determine whether the trial court erred in allowing the TAB to intervene.

An intervenor is not required to secure the court's permission to intervene in a cause of action or prove that it has standing; rather, a party who opposes the intervention has the burden to challenge it by a motion to strike. *See Guaranty Fed.*, 793 S.W.2d at 657; *see also* Tex. R. Civ. P. 60 ("Any party may intervene by filing a pleading, subject to being stricken out by the court for sufficient cause on the motion of any party."); Tex. R. App. P. 33.1 (to preserve complaint for appellate review, record must contain timely objection and ruling or refusal to rule). Because Dr. Richey did not object to TAB's intervention at the trial court, he has not preserved the issue for our review. *See Jones*, 642 S.W.2d at 554. We overrule Dr. Richey's issue concerning TAB's standing.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court declaring the 2002 fee guidelines valid and denying appellants' request for a permanent injunction against the guidelines' implementation.

_____

Bea Ann Smith, Justice

Before Chief Justice Law, Justices Kidd and B. A. Smith

Affirmed

Filed: May 20, 2004

20